[Crim. No. 2799.   First Dist., Div. One.   Sept. 29, 1952.]

THE PEOPLE, Respondent, v. GLEN E. REED, Appellant.

Sefton & Anderson for Appellant.

Edmund G. Brown, Attorney General, David K. Lener, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco), and William Acton, Assistant District Attorney, for Respondent.

WOOD (Fred B.), J.—Defendant was accused of violating sections 484-487 of the Penal Code (grand theft) in one indictment of five counts, and of violating section 474 of the Penal Code (sending a false message by telegraph and telephone) in another indictment of but one count.

The jury rendered a verdict against him upon each of the six charges. Upon his motion the court ordered a new trial on the third grand theft count. The district attorney then moved and the court ordered that the third count be dismissed. Defendant has appealed from the judgment and from an order denying a new trial as to the remaining five charges.

In support of his appeal defendant claims: (1) none of the grand theft counts charges an offense, (2) under none of the grand theft counts was there proof of the falsity of representations made by defendant, (3) in respect to three of the grand theft counts there was lacking the requisite corroboration, (4) each of the same three grand theft counts involved a loan transaction, (5) in respect to two of the grand theft counts the representations concerned the future, not facts

of the present or the past, (6) in one of the grand theft counts there was a variance between the pleading and proof, (7) in respect to the false telegram charge neither intent nor deceit was shown and the trial court was without territorial jurisdiction, and (8) the prosecutor committed prejudicial misconduct in asking leading questions.

(1) In each count the grand theft indictment accused the defendant of the crime of felony: violation of sections 484-487 of the Penal Code (grand theft) committed as follows: that on a certain date at the city and county of San Francisco he "did wilfully, unlawfully and feloniously take . . . [a designated number of dollars] . . . in money, lawful money of the United States, the personal property of . . . [the name of a person]." Defendant says the People's theory was that in each case the money was obtained by false pretenses and that therefore the indictment was fatally defective for failure to state the facts which constitute the asserted false representations. This point is not well taken. In charging an offense the statement that the accused has committed a specified public offense "may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. In charging theft it shall be sufficient to allege that the defendant unlawfully took the property of another." (Pen. Code, § 952.) The quoted words mean what they say. Each grand theft charge is sufficient. (*People v. Yant*, 26 Cal.App.2d 725, 730 [80 P.2d 506]. See, also, *People v. Pierce*, 14 Cal.2d 639, 644-646 [96 P.2d 784], and *People v. Dunn*, 40 Cal.App.2d 6, 12-13, and 17 [104 P.2d 119].) Defendant relies upon *People v. Walther*, 27 Cal.App.2d 583 [81 P.2d 452], but, as stated in a later decision by the court which rendered the decision in the Walther case, "No attempt was made in that case to charge the crime of theft under the provisions of section 952 of the Penal Code. Neither did the court there take into consideration the provisions in said section that 'It, (the count in the information or indictment), may be in the words of the enactment describing the offense.'" (*People v. Dunn, supra,* 40 Cal.App.2d at p. 13.) Defendant also argues that by amending the second paragraph of section 950 of the Penal Code in 1951 to require that a pleading contain "a statement of the public offense or offenses charged therein" in lieu of the former requirement for a statement "of the acts

constituting the offense," the Legislature manifested an intent that the acts be specified until the effective date of the 1951 amendment. We do not so view that amendment. All the Legislature was really doing in 1951 was to make the second paragraph of section 950 conform to the change in the law which was made in 1927 when the Legislature amended section 952 to permit the charging of theft by alleging that "the defendant unlawfully took the property of another." (Stats. 1927, ch. 612, p. 1043.)

(2) In respect to each of the grand theft counts, defendant claims there was a failure to prove the falsity of the representations made by the defendant. A brief résumé of the evidence will demonstrate that this point is not well taken.

█ *Count I* accuses defendant of taking $15,000, the personal property of Thomas F. J. Carroll, Jr. Carroll met defendant in January, 1950. At that time Carroll was in the restaurant business in Walnut Creek with Kenneth Arvidson and Stephen Forbragt. Defendant gave Carroll the impression that he was a man of great wealth, an industrial engineer and business expert. They next met, at Carroll's request, on February 4, 1950, to discuss a business proposition in which Carroll was interested, the purchase of a hotel and resort business. Defendant told Carroll (who was at defendant's home with Mrs. Carroll and Arvidson and a friend) of defendant's great wealth; that he had about $35,-000,000 in addition to $20,000,000 which was committed to defendant's Mt. Davidson foundation to build a hospital and business district on Twin Peaks in San Francisco. Defendant explained that he had been able to solve the income tax problem through the use of a charitable foundation.

On February 5, 1950, Carroll met defendant again. Defendant said that Carroll's problem could be handled under a charitable foundation which would allow a more rapid accumulation of capital.

Carroll told defendant that he and Mrs. Carroll owned 90 acres of land in the Walnut Creek area. Defendant suggested a "Carroll Foundation"; told Carroll that he (defendant) had all the money he wanted; his problem was to conserve it from taxation; he was not interested in making any profit; he would be glad to handle the organization of the foundation. The cost would be about $3,000, which defendant wanted immediately. Defendant decided that they should organize an engineering company to manage the affairs of the foundation.

Carroll got the $3,000 and gave it to defendant at defendant's office in San Francisco. Defendant gave Carroll a receipt.

Thereafter Carroll saw defendant almost daily at Carroll's restaurant. At these meetings defendant talked about foundations, the great wealth behind them, their management, how they cooperated one with another.

Carroll, his wife, and Arvidson believed these statements because defendant was prone to make quotations from the Bible and because of "his sincerity in doing things for other people," as Carroll expressed it.

In early March defendant announced that he had purchased the Quality Oil lease for the Carroll foundation for $3,200,000. Carroll, his wife and Arvidson told defendant that they did not have such money, that the thought was insane. Defendant told them that no money was necessary, that he had arranged for the sale of the lease to Mr. Munro (whom they had met earlier at defendant's home) for $4,500,-000, a paper profit of $1,300,000 and a net profit of $805,000 to the Carroll foundation. The Carrolls were to transfer their 90 acres to the foundation at a price of $90,750.

Two nights later defendant told Carroll that he had paid $30,000 of his own personal money as a deposit on the oil lease; he was not concerned about it, he was very happy to do it in order to help the Carroll foundation to get started, but he had used $15,000 of money that he had reserved for other purposes and it would be necessary to reimburse him for the $15,000 of the $30,000. He told them that the whole transaction would be closed in a matter of two weeks, by March 31st at the latest.

Carroll (on behalf of himself, his wife and Arvidson) told defendant that they did not have $15,000 available. Defendant said he had embarrassed himself in using the money set aside and it would be necessary for them to get the money. Carroll told defendant that the money would have to be borrowed, and he said "The trouble with you fellows is you don't realize your own ability and you will have to get over that. You have ability to try anything."

So the Carrolls borrowed the $15,000, giving as security a second mortgage on their 90 acres. They told defendant in advance that they were going to get the money and he told them to have the check cashed and to bring him the cash to his office in San Francisco. And they took the cash to him at his office. Defendant gave them a receipt reading: "Re-

ceived of Carroll Properties, Inc. Fifteen Thousand and no/100 Dollars on account of loan for purchase of oil lease'' (Ex. 4-B). Defendant told them the money was a repayment on the $30,000 he had loaned to them.

Defendant used $14,000 of this money to pay on a home he had purchased near Walnut Creek in November, 1949, and on which he was to pay $14,000 within 90 days. Carroll was not aware it was used for that purpose.

The Carrolls lost the 90 acres when the second mortgage (originally for 60 days, but twice extended for 30 days at a cost of $500 for each extension) was foreclosed. When there was no money on March 31 from the sale of the oil lease, defendant explained that the seller had gone to Europe and would be gone six weeks.

The falsity of defendant's pretenses is evidenced by the testimony of Claire Newport, a public accountant who was associated with defendant, who also was a public accountant, and kept his books. She testified that she was sufficiently familiar with the books to know that no such $30,000 transaction took place. She also testified that from all appearances defendant was a man of moderate circumstances; she saw no signs of wealth; he had no funds of his own, as far as she knew, to establish any foundation; he earned no money from his office during 1946 to 1951; at times he had a $5,000 bank balance which was usually borrowed money; he was constantly being pressed by creditors and suits were filed against him by them.

Defendant himself, asked if he was not so deeply in debt on February 1, 1949, that he could not make a financial statement which would pass a loan at the bank, said: ''Certainly. Had been right along.'' He admitted that in February, 1949, he owed in excess of $100,000, in various amounts to some eight or nine different persons; that he never filed an income tax return, never made any money. He testified he told Carroll and Arvidson he had purchased those oil royalties for $3,200,000; that it was not true, but he had reason to believe it was going to be true, but it had not been completed; that he told them he had resold for $4,500,000; that he did not have a definite contract for the acquisition of those royalties. He said he told them he made a deposit of $30,000 in connection with these oil leases; later, that he said nothing to the effect that the $15,000 was to be used in connection with the option, because the oil leases came after the $15,000 was paid; then, confronted with the fact that in the receipt for

the $15,000 he had written "On account of loan for purchase of oil leases," he said he put that in because he figured the Quality Oil leases would have to be purchased and that he knew more would have to be put out for that than $15,000; finally, that before the payment of the $15,000 he explained, to Carroll and Arvidson, these oil leases, what they were worth and so on.

█ *Count II* charges the taking of $3,000 from Helen Wagner on or about February 5, 1949. Helen Wagner met defendant in 1947 through Emile Darsow. Defendant obtained $500 from her either for sale of stock or for expense of organizing a certain corporation, and $2,600 as an advance for his and Darsow's expense upon business of the Mt. Davidson foundation.

In early 1949 defendant told her he had an agreement with the Thornbury family to sell $19,000,000 of the assets of the Thornbury foundation to the Mt. Davidson foundation.

Sometime in January, 1949, defendant told her of a deal to sell $500,000 worth of his Business Maintenance Corporation stock to a Mr. Day. He told her he needed $3,000 to buy revenue stamps to close the deal and asked her to lend him the money. She did. She gave him two checks. He promised to return the money in 60 days. Defendant gave her a note for $3,000 and another bonus note for $1,285. In March, 1949, defendant asked for a loan of $1,200 to pay for architectural drawings for the Mt. Davidson foundation; he told her that if this were not paid it would endanger the proposition and be detrimental to her interests and to her getting her money back. She loaned him $1,200 for 60 or 90 days.

In April, 1949, she loaned him an additional $500.

In May, 1949, she loaned him $750 upon his representation that he was about to be evicted from his office.

He told her he owned Christmas Island and that he valued it at $85,000,000. He showed her a certificate for 100,000 shares of stock in National Radio of Arizona and told her that R.C.A. had acquired that corporation and when he accepted the R.C.A. stock it would be worth about $3,000,000.

In June, 1949, she was trying to get her money back, particularly the $3,000. He said the $500,000 sale to Mr. Day had not gone through and that he had used the money for other purposes. He never asked her if he could use it for other purposes than for revenue stamps. About July, at his suggestion, she went to work in his office as a receptionist and remained there until February, 1951. She was not put on

the payroll but she received some payments ($1,900 or $2,000) in small amounts which were credited against the money that defendant owed her.

As to the falsity of defendant's representations, defendant admitted upon the witness stand that the revenue stamps would cost only 10 cents or 11 cents per $100 of value of stock upon an original issue, 5 cents per $100 for a subsequent transfer of stock; that all of the authorized stock of his Business Maintenance Corporation had been issued prior to February, 1949, at the face value of $300,000, in respect to which revenue stamps in the amount of $300 had been affixed; that said stock was entered on the books as of the value of $1,000; he knew at the time that the corporation had defaulted in payment of the state franchise tax and that its charter was "defunct." It was stipulated that the charter was forfeited for that reason on April 1, 1948, and was revived June 26, 1950. He did not recall how much of the $3,000 he had in mind at the time for revenue stamps, because there were some back payments to be made for services that had been rendered the corporation in connection with its organization. He admitted he told Mrs. Wagner he was going to sell to a Mr. Day for some $500,000; asked who was Mr. Day, he said "Mr. Day was the name of a man I don't care to disclose." In respect to assets running into the millions predicated upon a contract of January 15, 1949, with a Mr. Thornbury, it appeared that Thornbury died March 28, 1949, and that he left no estate, no life insurance, no funds of any kind. In other words, the contract with Thornbury furnished no basis for assets of any kind, even though defendant during the trial said there were tremendous assets in that contract.

Defendant further testified that at the time he got the money from Mrs. Wagner, neither his Business Maintenance Corporation nor his Mt. Davidson foundation had any assets.

*Count IV* charged the taking of $4,000 from Joseph Chapman. Chapman met defendant in December, 1950. Defendant told him of the Mt. Davidson foundation, the millions of dollars behind it, that he had earned $750,000 handling the trust funds. December 6, 1950, defendant told Chapman that a $7,000 check from one of his clients (a transit company in Santa Rosa, the Mendocino or Napa Transit Line) had been dishonored or returned unpaid and he needed $4,000 to cover checks written against it. On December 6, 1950, defendant gave Chapman a postdated check for $5,000 and on December 7, 1950, Chapman gave defendant a check for

$4,000. Chapman was to cash the $5,000 check and give defendant the difference between the $4,000 and the $5,000; he did not want any interest on his $4,000 loan to defendant. Defendant cashed the $4,000 check. The money was to be repaid in a few weeks but was never paid. Chapman considered this "purely a loan," not an investment.

As to the falsity of these representations, Miss Newport testified that she knew nothing of any $7,000 due defendant for services rendered to a transit company that ran bus lines in Santa Rosa, Napa and Mendocino county. She knew of no check in that amount sent to defendant's office for accounting services by the Mendocino Transit Company in the early part of December, 1950. She knew of no such sum in the early part of December, 1950, or at any other time, from the Mendocino Transit Company. Her testimony concerning defendant's financial condition and lack of business during 1946-51 tends to show that there was no accounting service transaction that would give rise to such a check. It appeared also by testimony of an officer of defendant's bank that defendant's account showed a deposit of $4,000 on December 7, 1950, but no deposit of $7,000 shortly before that date. Defendant testified that the $7,000 check was not given him by a client; it was given to him for collection; it had been drawn by a young man who came from a good family; this young man had made checks but his family had made his checks good on prior occasions.

Count V charged the taking of $7,000 from John Schlemmer. Schlemmer was Chapman's partner in the heating business. He met defendant through a Mr. Skottowe who was indebted to Schlemmer in the amount of $4,000 but could not pay. Skottowe was employed by defendant at a salary of $1,000 per month, but had not been paid his first two months' salary. Defendant was engaged in a ship patch venture and needed money. Defendant told Schlemmer that he had sold some patches to the government and had a contract with the government in negotiation. So he asked Schlemmer to lend him $3,000 and he would assume Skottowe's obligation to Schlemmer and he would pay the whole obligation in 30, 60 and 90 day payments. Defendant had a mortgage on a boat ("The Drip") for $2,500 and $1,250 on other equipment which he gave Schlemmer as security. The boat, according to defendant, was insured for $6,000 and could be sold for more than that amount. When the first payment was due, Schlemmer went to collect but was told by defendant

that he could not pay. Defendant said that things were not going along as fast as he had anticipated. About a week later defendant phoned Schlemmer, told him things were moving along but he still was not able to pay, that the Mt. Davidson foundation owed him $750,000 for services and when he got things straightened out with the foundation he would pay.

When the second payment was due Schlemmer again went to defendant. Defendant said things were progressing pretty well and they had a man in Washington who was negotiating a large contract. He needed $4,000 more to get the whole thing washed up and the U.S. Rubber Company was going to buy defendant out. Schlemmer loaned defendant the $4,000 on two notes, one for $2,000 due in 10 days and the other for $2,000 due in 20 days. None of the money was ever paid.

Concerning the falsity of defendant's representation to Schlemmer, the lack of assets of his Mt. Davidson foundation and his Business Maintenance Corporation show that he had no reasonable chance of realizing anything upon any putative debt of either of those organizations to him. A Mr. Boese, a boat builder of 19 years' experience who had known "the Drip" for three years (it had been moored at his dock) testified that during the years 1948 through 1950 it was worth between $800 and $1,000, $1,000 at the most. The evidence indicated also that the insurance on the boat amounted to only $2,625, not $6,000.

(3) Defendant claims there is lacking the requisite corroboration in respect to the proof of the charges made in Counts II, IV and V and since Penal Code, section 1110, requires corroboration for a conviction of the crime of obtaining money under false pretenses, the conviction must be reversed as to those counts.

Section 1110 provides: "Upon a trial for having, with an intent to cheat or defraud another designedly, by any false pretense, . . . or having obtained from any person . . . money . . ., the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances; . . ."

In respect to count II, defendant, asked if he told Mrs. Wagner he was going to sell his stock in Business Maintenance

Corporation to Mr. Day for some $500,000, said "That's right." Carroll testified that defendant made the same representation to him in June of 1950, about a Mr. Day buying $500,000 of Business Maintenance Corporation stock and defendant wanting additional money to pay for the revenue stamps. Asked if he recalled making such a statement to Carroll and Arvidson, defendant said "that's right," and that he told Carroll he had a party in mind he could sell some stock to, a man named Day who was willing to buy some stock.

Defendant testified he had discussed the Thornbury contract with Mrs. Wagner; they discussed a lot of things about the Thornbury contract prior to the $3,000 transaction; he could not recall exactly what was said; he mentioned it to her at that time because the getting of "those organizations" functioning hinged a great deal upon the Thornbury contract. Carroll testified that defendant told Carroll he had purchased the Thornbury family foundation, valued in excess of $18,000,000. Defendant admitted the Thornbury contract was mentioned to Carroll and Arvidson in connection with Carroll's $15,000 payment; they were to handle that contract for the affairs of the foundation and for the Business Maintenance, in which they would get 2½ per cent of the gross turnover of that contract; that contract calls for approximately $18,000,000 but defendant had seen enough evidence that it was more than that; he mentioned to them the amount that was in the contract and the fact that it would run into considerably more than that.

As to corroboration of count IV, defendant admitted upon the witness stand that he told Chapman that the $7,000 check came from a client, the Mendocino or the Napa Transit Company. According to Carroll defendant told Carroll in May, 1950, the same story about a $7,000 check that had been returned unpaid, and that defendant accordingly needed $5,000; but Carroll did not advance the money for he did not have it.

As to count V, defendant admitted on the witness stand that he made the specific statement to Schlemmer that the boat could be sold for more than $6,000. He also testified that he probably mentioned to Schlemmer that all the expenses "and so forth" of the Business Maintenance in conducting business for the foundation would be paid when they were properly operating. He did not know what the amounts were that the foundation owed him, it amounted to a great deal. Asked if he recalled mentioning the amount of $750,000 as

owing to him from the foundation, he said, "the amounts that were to be realized out of it would amount to that probably and more," and that he did not recall mentioning any particular amount.

The facts recited show that there was corroboration of the testimony concerning the making of false representations under counts II, IV and V. ■ Moreover, the facts proven under counts II and IV really show the obtaining of the money by trick and device, for which such corroboration is not required. (See *People* v. *Brennan,* 41 Cal.App.2d 143, 144-146 [106 P.2d 36], and *People* v. *Beilfuss,* 59 Cal.App.2d 83, 89 [138 P.2d 332].)

■ (4) The defendant claims that a loan transaction cannot furnish the basis for a criminal charge and concludes that the evidence under counts II, IV and V fails to prove the commission of a public offense. As well expressed in one of the cases upon which defendant relies, loan transactions "ordinarily create only civil rights and obligations and it is only where the evidence is sufficient to show larceny by trick and device or the obtaining of money under false pretenses that a borrower may be held criminally liable." (*People* v. *Lautenschlager,* 56 Cal.App.2d 615, 618 [133 P.2d 8].) In support of this statement the court in the Lautenschlager case cited four earlier decisions, each of which was a loan transaction induced by false pretenses or by trick and device, in which conviction was affirmed. In each of those four cases the fact that the money was obtained as a loan did not absolve the defendant.

■ (5) In respect to counts II and V, defendant erroneously claims that his representations pertained to the future, not to present or past facts. Count II charged the taking of $3,000 from Helen Wagner. Defendant represented to her that he had a deal to sell $500,000 worth of corporation stock to a Mr. Day and needed $3,000 to buy revenue stamps to close the deal; also, that he had an agreement with the Thornbury family to sell $19,000,000 of Thornbury assets to the Mt. Davidson foundation. Count V charged the taking of $7,000 from John Schlemmer. As security for the loan, defendant assigned to Schlemmer a mortgage on a certain boat, telling him the boat was insured for $6,000 and was worth more than that, and that the Mt. Davidson foundation owed defendant $750,000. These were all representations as to present facts, conditions, circumstances, qual-

ities or characteristics, not mere representations or promises that sometime in the future certain events might occur.

(6) Defendant further claims in respect to grand theft count V that there was a fatal variance between the pleading and proof. The indictment charges the taking of $7,000. It is true that the defendant did obtain $7,000 in separate amounts of $3,000 and $4,000, a few weeks apart, but they represented substantially a single transaction, moneys obtained for the putative purpose of facilitating the consummation of negotiations which defendant represented at the time were pending between him and the government in respect to his ship patching device.

(7) Concerning the telegram, which defendant admitted was false (he testified, "that whole thing was fictitious"), defendant claims that the trial court lacked territorial jurisdiction of the offense and that there was a failure to prove the requisite intent, and no proof of the possibility of deceiving, injuring or defrauding anyone. .

Defendant's dealings with Carroll and with Arvidson did not end in March of 1950, when he obtained the $15,000. In May of that year he sought unsuccessfully to borrow $5,000 from Carroll representing the money was to be used to cover checks he had drawn upon depositing a $7,000 check which was returned unpaid. He did get from Carroll $3,500 in May and $2,000 in August for the purpose, putatively, of bringing two attorneys from the east to set up the Carroll foundation. They never came.

By October, 1950, Carroll began to have misgivings. Carroll, Mrs. Carroll, and Arvidson drove out to see defendant and ask what this was all about. Defendant was tied up that afternoon with Mr. Schlemmer, could not talk to them, and suggested that they come back. Next, defendant asked Carroll to come out, saying it was very important, that something urgent had happened, that defendant must talk to them, and to bring Arvidson. When they arrived defendant told them he had just received a telegram on the oil lease. Carroll was shown a transcript of the message defendant said he had received over the phone. Later, defendant showed Carroll the telegram and read it to him. Defendant said the person who sent it was his agent, had handled a number of projects for him in Los Angeles, and had handled the oil transaction for defendant. Defendant told Carroll that this telegram was the evidence that the oil lease was safe, that he didn't

want to worry them before, so he didn't tell them he had fear in his mind that the deal might be lost, but now there was no question it was entirely safe; Mr. Munro had put up the $3,200,000 to secure the purchase; the balance of the $4,500,000 would be forthcoming shortly. Carroll believed that and continued to have faith and confidence. He continued to work with defendant, attempting to borrow money for payment of defendant's office expenses. It was not until January, 1951, that Carroll lost confidence in the defendant, when Carroll had a talk with Mr. Munro and Munro told him the oil transaction was a fraud.

The telegram, dispatched October 15, 1950, from Los Angeles to defendant at Walnut Creek, California, read as follows: "Oil royalties purchase completed secure and safe total 3278982 and 56. Stop. Turned over all papers Swartz attorney here. Stop. Field production cut which will drop monthly returns from average of seventyfive to sixtyfive. Stop. Next year cut again to fiftyfive and to stay there until 1965. Stop. Check your Richfield operating lease on this. Stop. Could not change name of purchases from West Coast Industrial Engineers to Cairns as requested. Stop. Your attorneys will have to do that. Stop. Swartz and Company certainly think a lot of Munro. Stop. No question or delay about draft. Stop. Congratulations on deal. Stop. You are still just small fry in oil game. Stop. Grace and I are now going on a well earned holiday to South America. Thanks to you and your associates. Stop. Will keep you posted to where we are. Stop. To phone you no success. Stop. Sent letter of confirmation on deal to your office. Stop. Have feeling something wrong up there. Stop. Knowing the importance of keeping this subrosa I worried so I thought I should wire. Stop. Goodbye and good luck. (signed) J C Keeler."

Claire Newport testified that on Friday, October 13, 1950, at his office in San Francisco, defendant told her he wanted her to go to Los Angeles and send a telegram for him. He did not at that time discuss what the wire would contain. He telephoned her the next morning from his home in Walnut Creek, dictating the contents of the telegram over the telephone to her. She was in San Francisco at the time of this telephone conversation between him and her. He suggested that she sign the telegram with the name of Mr. West. She suggested the name of J. C. Keeler, a relative of hers in New Hampshire who was not consulted about the use of his

name. She flew to Los Angeles and sent the telegram by Western Union, and returned to San Francisco.

Upon the basis of these facts we entertain no doubt that the Superior Court in and for the City and County of San Francisco had jurisdiction. "When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county." (Pen. Code, § 781, as enacted in 1872 and in effect during 1950.) Defendant and Miss Newport were in San Francisco when he instructed her to go to Los Angeles and send the telegram. She was in San Francisco when over the telephone he transmitted to her and she received from him the very words to be incorporated in the telegram. She then flew to Los Angeles and on October 15 sent the telegram to him in Contra Costa county. Here we have a chain of events, all interconnected, occurring within a short period of time and constituting a single transaction. We conclude that acts requisite to the consummation of the offense charged occurred in two or more counties, one of the counties being the City and County of San Francisco. (See *People* v. *Megladdery,* 40 Cal.App.2d 748, 774-780 [106 P.2d 84].) Defendant argues that because the telegram was sent in October, months after defendant got the $15,000 from Carroll in March, 1950, defendant could not have harbored an intent to injure, deceive or defraud Carroll. That argument misses the point. The facts which we have recited warrant an inference that defendant sought by this false telegram to continue to deceive Carroll concerning the oil lease, to postpone the time when Carroll would lose confidence in defendant and meanwhile to get more money from Carroll. He did by means of this telegram bolster and renew Carroll's confidence in him for an appreciable period of time. ▮ However, the statute does not require the accomplishment of injury in the sending of a false telegram. It is the sending of such a telegram with knowledge of its falsity "with the intent" to deceive, injure or defraud another which constitutes the crime (Pen. Code, § 474.) ▮ "The expression 'intent to deceive' used in section 474, is broader than the expression 'intent to defraud,' used in section 470 of the Penal Code, and is not limited to an act whereby one does or may suffer financial loss." (*People* v. *Norwoods,* 100 Cal.App.2d 281, 288 [223 P.2d 490].)

356

(8) (8) In support of his claim that the district attorney committed prejudicial misconduct in asking leading questions of witnesses, defendant cites some six isolated instances of leading questions asked by the People, objected to by the defendant, and not permitted by the court. That, in a transcript of testimony embracing 665 pages does not impress as formidable, especially in the light of the fact that none of those questions was answered in view of the trial court's rulings, and defendant did not at the time assign the asking of any of the questions as prejudicial misconduct or request the court specially to admonish the jury to disregard those questions or move the court for an order declaring a mistrial. This point is not well taken.

The judgment and order appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.