[Crim. No. 994. Fourth Dist. Dec. 8, 1955.]

THE PEOPLE, Respondent, v. RAY ADAMS, Appellant.

Z. B. West and Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—The grand jury indicted defendant and appellant Ray Adams on two counts, Count I with conspiracy, and Count II with grand theft of personal property of the value of $8,500, to wit, a cashier's check in that amount belonging to Melitas Forster. Defendant admitted a charge of prior conviction of a felony and that he served a term of imprisonment therefor in a federal prison. A trial by jury resulted in a directed verdict of not guilty on the first count, and a verdict of guilty on the second count.

Prior to trial the court overruled a general demurrer to the indictment and denied a motion to quash. Exception is taken thereto on this appeal. A transcript of the grand jury proceedings does not appear in the record. ■ Matters outside the record may not be considered on an appeal. (*People v. Ruiz,* 103 Cal.App.2d 146, 150 [229 P.2d 73]. No error appears in the rulings. (*People v. Reed,* 113 Cal.App.2d 339 [248 P.2d 510].)

The main contention is that the evidence is insufficient to support the verdict on the second count. Considerable evidence was submitted to the jury in respect to the first count which was not particularly applicable to the second count.

In 1952-1953, William G. Bonelli was a member of the board of equalization of the district which included Orange and Los Angeles Counties and the board had exclusive power to issue and control the transfer of liquor licenses subject to certain rules and regulations. Herman Pause was supervising liquor control officer for Orange County. His imme-

diate superior was H. E. MacKenzie, district liquor administrator. There had been a limitation on the number of "P" (on-sale) licenses in effect since 1939, and no new licenses were issued in that district between 1945 and 1951, and because of this limitation P licenses acquired a value on transfer ranging as high as $10,000 to $15,000. A new census increased the number of licenses allowable, and applications therefor were accepted in limited numbers, mainly from people who came into Pause's office. Ordinarily, no application would be received unless consent was obtained from Mr. MacKenzie. In 1952, about 42 additional such licenses were issued containing the approval of Pause and MacKenzie, and it was indicated that no license application recommended by them was ever refused by the board.

Prior to December 10, 1952, Melitas Forster, being the holder of an "A" (on-sale beer and wine license), attempted on several occasions to make an application to Pause for a P license but her application was refused. She inquired around generally and endeavored to secure such a license "any way she could," whether by purchase, by transfer, or by securing a new one. On December 6, 1952, according to her testimony, she received a telephone call from defendant Adams, who was a member of the Tavern Association to which she belonged, and he told her he heard she was interested in obtaining a P license and she said she was; that defendant said "he knew of one or something that would run $8,500 to get," and that it would be necessary to act quickly; that she told him she did not have that amount of money but would go to the bank and borrow it; that defendant agreed to come to her apartment on December 8th, after she obtained it; that she borrowed the money from the bank and secured a cashier's check for $8,500 made payable to her as advised by her attorney; that defendant came to her apartment on December 8th and conversed with her generally in the presence of a friend and then proceeded out into the hall where Miss Forster gave him the check, unindorsed, because she was leaving on a trip and would not return for some time, and she told him that if the license transaction went through she would, on her return, endorse it over to him; and that defendant then told her to apply to Pause the next day and have a license. She stated that there was no particular statement made on that occasion as to "where the money was to go"; that on December 12th she applied for the license, as instructed, and Pause refused it on several occasions and

finally Pause told her he could now take her application; that she filled it out (the record does not indicate whether or not she directly paid the $325 fee required by law for such a license) ; that soon thereafter she left on her trip and returned about the end of January, 1953, and found the P license had been received at her place of business; that defendant contacted her and asked her to lunch with him; that a conversation was had about the license and she told him ''that is a lot of money to pay for a license . . . or something like that'' and she thought he said: ''he was only going to get a small part of it''; that she then endorsed the check and Adams took it with him because she had a feeling that defendant did something to help get the license because there was talk among the tavern owners about what was being paid for the new licenses that were issued.   It would be a proper inference from the testimony that she believed from defendant's actions and statements that it was represented by defendant that a considerable portion of this money would be paid to others in order for her to obtain the new license, and that she was led to believe that defendant was not to retain all of it.   She testified she never received any of it back from him and did not ask for it because she had a license and that was what she wanted.   She testified she knew defendant was executive secretary of the Tavern Association and went to Sacramento as a lobbyist for the association and there attended meetings of the board of equalization.

The check involved was received in evidence.   Mr. Cole, who operates a bar and a check service in Los Angeles, testified he knew defendant well; that defendant came to him to cash the $8,500 check and, without requiring an endorsement by him, he cashed it; that a couple of days later defendant came around and picked up the money; that because of his friendship for defendant he charged no fee for this service; and he was surprised to learn he had not required defendant to endorse the check.   When an investigation started in reference to this license, the witness was confronted with the check and asked to relate the circumstances.   He stated that after this conversation he called the defendant and told him about the investigation and that defendant said he wanted to talk to him about it and that he told defendant what he had told the investigator about the transaction as he remembered it and that defendant thereafter asked no questions but remained silent.

The investigator for the attorney general's office, R. F. McCarthy, testified that on September 17, 1954, after defendant found out he was being sought as a witness, defendant telephoned this investigator at a private telephone and then told him to go to a public pay station and call him at a certain designated number which he gave to him; that this was done and defendant answered and said he was in a difficult position; that he was mysterious about the telephone calls because of having been in Orange County the day before, had contacted several different owners and had learned that the information had gotten out that Melitas Forster had given him a check for $8,500 in payment of a license. He then stated:

". . . that because of his position with the Tavern Owners Association he didn't want to become involved, but that he had a program afoot where he was trying to learn who it was and how it was that these licenses were being issued in the Fourth District; that he had on numerous occasions difficulties with Artie Samich, who at that time was a lobbyist in Sacramento in the liquor industry, to the effect that he was interfering with Mr. Samich's programs, and they even went so far as to try to remove him from his job, and because of that he was mysterious all the way through; that he was in a difficult position, and felt that when he would discuss it with us he would clear the entire matter up to our satisfaction only if the information would go to the Attorney General, to the Governor, the Supreme Court and other officials''; that he then stated he ''thought we did a good job in getting the information from Melitas Forster, but that it did interfere with his plans considerably; that . . . this having developed he wouldn't be able to go on with his thoughts that he had in mind . . . that he took the check to Mr. Cole, a friend of his, for the purpose of having it cashed, and also so that Mr. Cole would have knowledge of this transaction . . .''; that he ''Went on to state that he would get hold of his attorney . . . and ask him permission to discuss the situation with us, but informed us emphatically that he wouldn't give'' his attorney ''all the particulars concerning the Forster deal''; that he asked him ''as to why he would tell him anything at all if he did not confide in him and not tell him everything''; and that he stated ''he didn't have complete faith in'' his attorney ''and that he didn't want this information to get back to the members of the Tavern Owners; that if it did it would break up his

entire program of trying to learn how these licenses were being issued"; that he "Stated further that if I were to relate this to anyone else before he had permission from his attorney to discuss it with us, that he would deny ever having discussed it with us at any time"; that he "asked him before hanging up if he would tell me what he did with the $8500, and he answered it by stating that when we did learn what he had done with—that we would be considerably surprised, but he wouldn't discuss it any further at that time."

Portions of this conversation were corroborated by another investigator who listened in on the conversation.

Essentially, the defense consisted of the testimony of character witnesses and of the testimony of defendant himself to the effect that he received the money in question from Miss Forster as payment for a service. He testified in part that he represented the interests of on-sale liquor licensees of the association of which he was executive secretary in public relations and legislative matters; that he was well acquainted with the members of the board of equalization and had known Mr. Bonelli for 20 years; that he attended nearly all of their meetings; that on November 20, 1952, he was present and had a conversation with Mr. Bonelli as to whether he was going to allow any more licenses to be issued in Orange County, and that Mr. Bonelli told him he would approve licenses there provided they were for qualified establishments; that subsequently he conversed with Miss Forster and told her that he heard she was interested in obtaining a P license; that she said she was but was not in any position to pay $12,000 to $14,000 for one; that he asked her how much a new license would be worth to her and she said $8,500; that he told her he was not sure that he could do her any good but he would try and that she said she would have the $8,500. She asked him how she would know whether she would obtain her money back if she did not receive the license and that he suggested she place it in escrow, and that if he did have influence enough she could give him the money then, and that he probably made the suggestion that she obtain a cashier's check made out to herself, unendorsed; that she did give him such a check and that he then told her to file her application the next day; that in a telephone conversation of December 9th, she told defendant that Pause had refused to accept it because it had not been approved by Mr. Mac-Kenzie, and that he told her this was the first time he ever

heard of such a requirement and that he would find out about it; that he telephoned Mr. Bonelli and he was not in but he told his secretary about it and she said she would leave a note for Mr. Bonelli about it and also contact Mr. MacKenzie; that the next morning she went to the office in Santa Ana and her application was accepted and Mr. Pause told her Mr. MacKenzie had approved it; that he did nothing further at the time with respect to her license application other than to call Mr. Bonelli's office; that he followed through and checked with the Santa Ana office according to his regular procedure and learned that the application had been accepted.

With reference to the cashing of the cashier's check by Mr. Cole, defendant testified that when he learned that the check had been cashed without his endorsement he was quite surprised; and that he never gave any of the money to Mr. Bonelli, Mr. MacKenzie or Mr. Pause or anyone else in connection with the securing of her license. He admitted the conversation with the investigator for the attorney general but claimed the strange method he used in connection with the telephone conversation was due to his knowledge of ''how they frame you up with these little records when you call them at their offices''; and that he had been engaged in conducting an investigation for 15 years on his own to find out about what was going on. He stated that what he told McCarthy was the truth, as far as he knew, and when asked about where the $8,500 went, on cross-examination by the district attorney, he testified he did not know but that he had spent it for his own personal purposes; that he took $3,500 to Sacramento as advances on his expenses and paid $2,550 income tax on the $8,500 he received. He admitted that after September, 1954, an amended income tax was filed by him in reference to the $8,500 he received in 1953, after the investigation in this matter was under way. Defendant testified he told Miss Forster he would do everything possible to see to it that she got a liquor license but that he did not tell her what he was going to do or how he was going to do it.

Both Mr. MacKenzie and Mr. Pause testified at the trial that defendant did not intercede on behalf of Miss Forster to obtain the license. They did not recall that he ever talked to them about it; that they received nothing by way of compensation for the issuance of the license; and that there was no reason why her license should not have been issued in the ordinary course.

It is defendant's claim that the evidence falls short of showing any false pretense or misrepresentation relied upon by Miss Forster which caused her to part with her money, and since she received what she bargained for and at the price agreed upon, no theft by false pretenses was committed.

A very close question is presented in this respect. ■ The express testimony of a victim of false pretenses that he was induced to part with his money by the fraudulent statements of the accused is not essential to the successful prosecution of an action for theft by false pretenses, but it is sufficient if the inference of his reliance could have been drawn from all the evidence. ■ An appellate court will assume in support of a judgment of conviction the existence of every fact which the jury could have reasonably deduced from the evidence, and will then determine whether the facts justify the inference of guilt. ■ An inference is evidence, and must prevail unless it is overcome by other evidence. ■ Any inference of fact which the jury may reasonably draw from the evidence is entitled to the same consideration in support of its finding as findings of fact upon conflicting evidence. ■ If a finding is based upon a reasonable inference it is not within the power of the appellate court to set it aside any more than it is within its power to set aside any other finding supported by sufficient legal evidence, for a finding of fact, based upon reasonable inference drawn from facts proved with legal sufficiency, is as much, and as completely as is any other, a finding based upon good and sufficient evidence. (10 Cal.Jur. p. 740, § 61; *Bompensiero* v. *Superior Court*, 44 Cal.2d 178 [281 P.2d 250].)

The jury was fully instructed that every person who knowingly and designedly, by any false or fraudulent representation or pretenses defrauds any other person of money, is guilty of theft, and that "the false pretense used must be a fraudulent representation of an existing or past fact by one who knows it to be not true, or who makes the representation recklessly and without information justifying a belief that it is true, and it must be such as is adapted to induce the person to whom it is made to part with something of value"; that it is not necessary that the fraudulent representation be made by words, if it may reasonably be inferred from a person's act and conduct; that proof of these four facts must be made against the defendant before he may be found guilty of the crime of theft by means of false or fraudulent representations or pretense: (1) The defendant must have intended to defraud the person named in the indictment as

the one against whom the crime was perpetrated; (2) actual fraud must have been committed by the defendant against that person; (3) some false representation or false pretense must have been used by defendant for the purpose of perpetrating the fraud, and must have been a material element in inducing the owner to part with the property; and (4) the fraud must have been accomplished, that is, the defendant, by means of the fraud, must have induced the owner to part with the property, the owner intending to divest himself of title, and the defendant thus must have obtained the property.

This was followed by another instruction in the language of CALJIC 227, to the effect that:

"In order for a false representation to be a material element in inducing an owner to part with property, intending to divest himself of title, the owner must rely wholly or in part, as he has a right to do, on that representation, and he must act in that reliance. Hence, although an owner of money is under no duty to make an investigation, and has the right to rely on the representation made to him, if, before transferring property to another, he does make independent inquiry or investigation and relies thereon rather than on any representation made to him by the other person, or when, for any reason, the owner does not rely on any false representation or pretense made to him by that other person, the latter is not guilty of obtaining said property by false or fraudulent representation or pretense."

An instruction in the language of CALJIC No. 223 was also given respecting theft by trick and device.

Under the evidence and instructions given the jury might well have inferred that defendant did represent to Miss Forster that upon the payment to him of the sum of $8,500 he would be able to secure a new license for her and at no price less than that amount; that to do so it would be necessary for him to pay a considerable portion of that amount to others to bring about the issuance of such a license; and that when she complained about the price fixed by defendant, he said he was only going to get a small part of it when, in fact, he stated he kept all of it, and apparently, from the record, it was not necessary to pay any portion of it to anyone, since it probably would have been issued in due course.

Defendant's conduct, after being presented with the surrounding facts, and the evidence pertaining to the delayed filing of the amended income tax return, rather indicates that the representations inferentially made by defendant were not

entirely true and that if Miss Forster had known the truth of the transaction she would not have turned that amount of money over to defendant for his personal use. At least the jury was justified in so believing and that the defendant misappropriated in excess of $200 in keeping the entire sum.

This conclusion receives some support in the case of *People* v. *Chamberlain*, 96 Cal.App.2d 178 [214 P.2d 600], where the evidence showed that defendant obtained money from the victim on representations that he could and would "fix" a horse race, but instead appropriated the money to his own use. The court held the conviction to be sustainable on the theory of theft by trick and device as well as by false pretenses. See also *People* v. *Edwards*, 72 Cal.App. 102, 113 [236 P. 944], where it was held (quoting from the syllabus) that:

"A taking, within the definition of larceny, occurs when a person, with a preconceived design to appropriate the property to his own use, obtains possession of it by means of fraud or trickery; and in such case the fraud vitiates the transaction, and the owner is deemed still to retain a constructive possession of the property"; and that "It is essential in cases of larceny committed by means of fraud that the owner shall intend to part with the possession only, and not to pass the title as well. If he intends to pass both the possession and the title, the transaction, though it may amount to the crime of obtaining property by false pretenses, will not constitute larceny"; and that "The owner does not part with the title to the alleged thief where the thing which is the subject of the theft is delivered by the owner to the accused to be applied by the latter to a particular purpose, and the recipient of the property, having obtained the possession fraudulently with the preconceived intention to appropriate the property to his own use, does subsequently convert it to his own use instead of applying it to the purpose contemplated by the owner."

In that case the evidence and inferences therefrom showed that the complaining witness delivered a sum of money to the defendant upon the latter's representation that it would be used in some manner to corrupt officers investigating criminal charges against the husband and brother-in-law of the complaining witness, that the representation proved to be false and the possession of the money was obtained with a preconceived design not to devote the same to the purpose for which it·was delivered to defendant but to convert it to his own use.

■ Defendant contends that neither title nor possession, in the strict sense, passed to defendant until the occasion when the check was endorsed, around the latter part of January, 1953, and that this constitutes a variance from the date alleged in the indictment, namely, December 8, 1952, citing such cases as *People* v. *Cravens*, 79 Cal.App.2d 658 [180 P.2d 453] ; and *People* v. *Tufts*, 167 Cal. 266 [139 P. 78]. The variance in reference to the time of the taking, as alleged, and the date of the endorsement of the check would be immaterial under the facts of this case if the previous false representation was the motivating cause of the transfer of title and possession of the check. ■ When one has knowingly and designedly by fraudulent representations defrauded another, the representations shall be treated as continuing so as to cover any money, property or services received as a result thereof. (*People* v. *Rice*, 73 Cal. 220, 221 [14 P. 851] ; *People* v. *Murray*, 91 Cal.App.2d 253, 257 [204 P.2d 624] ; *People* v. *Lyon*, 135 Cal.App.2d 558 [288 P.2d 57] ; *People* v. *Sheffield*, 9 Cal.App. 130 [98 P. 67] ; *People* v. *Frankfort*, 114 Cal. App.2d 680, 704 [251 P.2d 401].)

Defendant next contends that the evidence shows that Miss Forster did receive what she bargained for and accordingly he could not be guilty of theft by false pretenses, and that the court's failure to give his proffered instruction to this effect was error, citing *People* v. *Ingles*, 117 Cal.App. 22, 24 [3 P.2d 341] ; *People* v. *Tufts, supra*; and 25 C. J. p. 609 [§ 38] 9.

■ While this rule of law may be applicable under certain circumstances, it cannot be said that a person receives what she bargained for if it is falsely represented to her that to obtain a certain article or license costing $325, it would take $8,500 to obtain it because it would be necessary to pay a considerable portion of that amount to others, and that he was only going to retain a small amount of it. The jury was instructed on the subject and had a right to believe that the party defrauded would not have otherwise parted with possession of the money. The court fully instructed the jury on the elements of the offense. No prejudicial error resulted in the failure to give the proffered instruction as proffered. (*People* v. *Raines*, 66 Cal.App.2d 960, 962 [153 P.2d 424].)

■ Lastly, it is contended by defendant that if there were any false pretenses established, by inference, circumstantial evidence or otherwise, there was no corroboration thereof, as required by section 1110 of the Penal Code. Under the

evidence above related, the requirement for corroboration is satisfied particularly where the defendant admits having substantially made the representations as testified to by the complaining witness. (*People* v. *Reed,* 113 Cal.App.2d 339, 350 [248 P.2d 510] ; *People* v. *Frankfort,* 114 Cal.App.2d 680, 701 [251 P.2d 401].)

Judgment and order denying a new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 5, 1956. Gibson, C. J., did not participate therein.