[Crim. No. 1084.   Fourth Dist.   Sept. 27, 1956.]

THE PEOPLE, Respondent, v. E. L. HENDERSON, Appellant.

Wesley B. Buttermore for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

GRIFFIN, Acting P. J.—Defendant was charged with the crime of conspiracy to commit theft (Pen. Code, § 182, subd. 1) claiming that on January 11, 1954, he voluntarily agreed with a person referred to as John Doe to commit said act. Four separate overt acts are charged claiming that in further-ance thereof (1) John Doe sold Glen Fronabarger a punch board; (2) defendant entered a service station; (3) John Doe sold one Lester Root a punch board; and (4) defendant wrote a letter to a certain bank in San Diego. A verdict of guilty was found by the jury and a motion for new trial was denied. Defendant was sentenced to state's prison. On appeal he contends: (1) that the evidence is insufficient to support the judgment; (2) that the prosecuting attorney en-gaged in prejudicial misconduct; and (3) that the court gave an erroneous instruction.

On January 11th or 12th, 1954, an unidentified person (hereinafter referred to as John Doe) appeared at three service stations in San Diego County to sell certain items, including punch boards, and was seen driving a certain described light-colored Mercury car. Despite the station operators' unwillingness to accept the punch boards, John Doe left a baseball punch board at each of these stations

upon a consignment basis. This game consisted of a board indicating baseball teams and bets were made by the customer that if a named team was uncovered by the draw, the Phillies would pay nothing and so graduated up to 20 for 1 on New York. The board had painted on it "Play Ball—Pick your favorite team"; "State Approved," with a gold seal; "Tax paid at rate prescribed by law"; "play 10¢ up." Within two or three hours thereafter, on the same day, defendant appeared at each of these service stations and won money from each of the service station operators, all under similar circumstances, namely, that defendant would start out losing, would continue playing, and finally select a 20 to 1 winner, whereupon he would stop playing the punch board, collect the money and leave. John Doe never returned to any of these stations to collect the price of the boards. In each instance he had spoken about selling vending machines when he approached these three service station operators but finally ended the transaction by leaving the punch boards and agreeing to return and collect from the operators $4.50 for each of them, and allow them to keep the remaining profits which he assured them would return a profit and they could keep it. Altogether, Mr. Root, an oil station operator, lost about $110 to defendant, and Mr. Fronabarger $130, $70 of this amount being represented by a check drawn on the Bank of America, Logan Heights Branch, on which the maker stopped payment. Mr. Siekmann lost $140. The check was made payable to E. L. Henderson, and was endorsed and forwarded to the bank with a letter of instruction dated January 11, 1956, to send a cashier's check to him at General Delivery, Phoenix, Arizona. The police in Phoenix were alerted to watch the post office there but E. L. Henderson did not appear. Considerable publicity was given in the papers of the affair.

It appears that immediately after these transactions the defendant left town and was apprehended in Oklahoma. Before the time set for his extradition hearing, and while out on bail, defendant departed to Mississippi and his attorney, who was on defendant's bond, returned defendant to Oklahoma. The police officer who returned defendant to California testified that while en route defendant voluntarily stated (retracting a previous statement of denial) that he was the man who punched the punch boards in the service stations; that when he asked him why he visited all of the service stations in one short period of time, defendant declined to answer; that when he asked defendant if he went to the General Delivery

window at the post office in Phoenix, Arizona, to pick up the check defendant said "No"; that when he remarked to defendant that payment had been stopped on the check defendant said "Someone is liable to get in trouble over that . . . possibly someone at the bank." Defendant was identified by the three service station operators as the one who took the money.

It is the People's claim that the evidence sufficiently shows a conspiracy or agreement between John Doe and defendant by showing a definite pattern of operation by them; that John Doe assured the station operators there was a profit to be made from the boards and they could not lose when in fact both defendant and John Doe knew that within a short period of time defendant would appear, play the game, and, as a "come-along" would lose until the proper time, when a larger wager would be placed and he would win on a 20 to one tab; that in fact he knew the key location of the several tabs all the time by prearrangement with his accomplice; that the accomplice assured the service station owners they could not lose on the boards but would make a profit; that John Doe represented he would return in a short time after he left the boards; that they would show a profit; and that he would then be reimbursed in the sum of $4.50 each for the cost of the boards.

Defendant relied on an alibi, claiming that at the time of the events in San Diego he was at Hot Springs, Arkansas. He denied playing the punch boards here in question or making the admissions to the officer, and produced a witness who testified that defendant stayed with him during that period at a hotel in that place while defendant was taking a course of baths. On cross-examination the witness acknowledged that defendant was not registered at the hotel.

Defendant's son testified that he drove defendant to Hot Springs around January 1st, 1954, and returned for him after January 15th. There is evidence that at about this time and prior thereto defendant owned a light-colored Mercury car. The evidence is sufficient to support the finding of the jury that a theft was committed and that a conspiracy did exist between defendant and John Doe to commit the crime in violation of section 182, subdivision 1 of the Penal Code. (*People* v. *Sica,* 112 Cal.App.2d 574, 581 [247 P.2d 72] ; *People* v. *Adams,* 137 Cal.App.2d 660, 669 [290 P.2d 944] ; *People* v. *Henry,* 86 Cal.App.2d 785 [195 P.2d 478] ; *People* v. *Edwards,* 72 Cal.App. 102, 113 [236 P. 944] ; *People* v. *Daener,*

96 Cal.App.2d 827 [216 P.2d 511].)  Contrary to defendant's claim, the evidence is sufficient to connect the defendant with the commission of the crime.  (*People* v. *Porter,* 105 Cal.App. 2d 324, 329 [233 P.2d 102] ; *People* v. *Daener, supra.*)

A more serious question arises as to the claim of prejudicial misconduct on the part of the prosecuting attorney.  It principally involves testimony elicited from defendant by way of cross-examination and in the prosecutor's argument to the jury.  As part of the cross-examination defendant admitted he did not register at Hot Springs, Arkansas, but stated he just moved in with a Mr. Sells; that prior thereto he had had Oklahoma, Idaho and Nevada license plates on his Mercury car due to his traveling in the different states in his line of business.  He was then asked if he had not played these or similar punch boards before and he said that he had.  Apparently, while the prosecutor was examining some document before him, defendant was then asked if he had not won $140 from a certain man in Arizona.  Defendant answered "No."  He was then asked if he did not win $16C from a certain named person at a gas station in Mahoning, Pennsylvania, and he answered "No" but did say he was in that city with one H. W. Duke, and did win a television set on a punch board owned by the chief of police.  He was then asked about other cities and places and counsel for defendant objected to this line of questioning.  The objection was overruled and the prosecutor continued to ask about other places and about defendant being lucky at punch boards in these several places.  Defendant admitted being at some of them at certain times but denied any punch board activities.  As to one place he volunteered the information that he was arrested there, but stated it did not involve a punch board; that in these places where punch boards were all about town he played them but lost more money than he won.  Defendant's counsel claims that this extended cross-examination as to whether defendant had been lucky on punch boards in the several states was outside the scope of the direct examination, and that cross-examination is permitted only upon matters about which he was examined in chief, citing section 1323, Penal Code, and such authorities as *People* v. *Zerillo,* 36 Cal. 2d 222 [223 P.2d 223] ; and *People* v. *Arrighini,* 122 Cal. 121, 126 [54 P. 591].  No evidence was presented by the prosecutor to disprove defendant's statements in reference to his whereabouts on these particular occasions or that he was engaged in any wrongful acts pertaining to punch boards.

Defendant was charged with a conspiracy which the prosecutor believed was being practiced over many states, and he was endeavoring to show this by the cross-examination of the defendant. It is the rule that under such a charge some greater degree of latitude is allowed in cross-examination of the defendant, particularly when it relates to defendant's memory as to his whereabouts on a particular occasion or as to the intent and pattern or general plan involved in the claimed conspiracy, or for possible grounds of impeachment. (*People* v. *Theodore,* 121 Cal.App.2d 17, 24 [262 P.2d 630]; *People* v. *Henry,* 86 Cal.App.2d 785, 786 [195 P.2d 478]; *People* v. *Tarantino,* 45 Cal.2d 590, 599 [290 P.2d 505]; *People* v. *Kerns,* 134 Cal.App.2d 110 [285 P.2d 81]; *People* v. *Hoyt,* 20 Cal.2d 306, 318 [125 P.2d 29].)

The vice of the prosecutor's conduct was the use of the testimony adduced on this cross-examination by inferring to the jury in his argument, in effect, that he had not been able to prove other similar offenses, but was personally assuring the jury that the defendant was guilty of such other offenses. He said:

"Counsel (for defendant) says, 'Well, there is a little something in here about a punch board winning back in, I believe it is, Mahoning City' . . . He says 'You could have stopped in one of the gas stations and won'." (Continuing, by the prosecutor): "If you stopped into the gas station and won would I know about it? Would it be a matter of record some place, if it was a legitimate, above-the-board deal, if it was all legal okay, why would I know about it?"

Serious objection was made to the statement but overruled. The prosecutor then proceeded:

"You (the jurors) answer that question for yourselves. If you have won, and I imagine during the course of your life maybe you picked up something, maybe on a punch board, maybe some other way, but would I know about it if it was open and above board?"

This was in reply to the argument of counsel for defendant who said there was nothing wrong about defendant being in these particular towns when he was engaged in the carnival business; that defendant frankly admitted he had been in various states, had been arrested in one place mentioned, and it was easy for the prosecutor to stand up there with a sheaf of papers and ask him if he wasn't in a certain town at a certain time when there was nothing illegal about it.

It is a general rule, as held in *People* v. *Perkin,* 87

Cal.App.2d 365, 368 [197 P.2d 39], and *People* v. *Smith,* 100 Cal.App. 344, 349 [279 P. 1022], that a defendant is not in a position to complain of prejudicial error where the remarks in question are elicited by the challenge of defendant's counsel, and where the trial court ordered the jury to disregard the remarks. In the instant case the court did not so admonish the jury and there was no request to do so, but objection was made to that line of argument. ■ It is misconduct for a prosecutor to state or infer the existence of facts concerning which no evidence has been introduced. (*People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1] ; *People* v. *Pantages,* 212 Cal. 237 [297 P. 890] ; *People* v. *Devine,* 95 Cal. 227 [30 P. 378].)

■ We are again confronted with a similar example of misconduct on the part of the prosecutor in reference to the testimony of the defendant's witness Sells, who testified that defendant was at the hotel with him on the dates indicated. On cross-examination by the prosecutor the witness was asked if it was not true that the only Henderson registered at the Hot Springs Hotel between January 1 and January 21, 1954, was W. D. Henderson from January 4th to January 8th. The witness answered that he did not know W. D. Henderson. Then he was asked: "Now, if a police officer just called Hot Springs, Arkansas, and got that information——." The court properly ordered the question and inference that might be drawn from it stricken. It would be difficult to erase the inference from the minds of the jurors, especially in view of the showing by an uncontradicted affidavit of defendant on a motion for new trial that during the argument of defendant's counsel a police sergeant who had been seated by the prosecutor went to the telephone located at the clerk's desk in the courtroom and carried on a conversation with someone; that the jurors were watching him; that thereafter he returned to the prosecutor's table and whispered in the prosecutor's ear; that they then turned and nodded in the direction of the witness Sells; that the officer then left the courtroom and returned with a yellow sheet of paper and handed it to the prosecutor and they both looked over toward Sells; that later Sells got up and walked out of the courtroom and both the officer and bailiff followed him; that the bailiff later returned and the other officer and Sells never returned to the courtroom before the case was submitted to the jury.

Previously, in the argument of counsel for the defendant to the jury he remarked about the credibility of Sells' testimony

and said: ". . . if that were not the truth, you can bet your bottom dollar that Mr. O'Laughlin would have been on the phone and if he had determined that were not the truth he would have asked for a continuance to get a witness out here to discredit Mr. Sells.''

In the final argument of the prosecutor he said: ''Don't let perjured testimony walk this man out . . . maybe because of the time element I couldn't prove perjury in this case, but don't let that scare you, I am going to prove it in another case. That man perjured himself and I am prepared to prove it at a later date, but because of the time element and the fact that I couldn't get subpoenas and get people back here I can't disprove that, but make no mistake about it, it is going to be proved later on in front of another jury. That is perjury and don't let perjury defeat criminal justice.''

Then follows a closing statement by the prosecution:

''What good does it do for the police officers, . . . to spend their time and effort in ridding this county of these rascals and its rats if they come in here and a jury, because of the unreal dream of an innocent man . . . you rid this county of this rascal and his rackets.'' On a motion to correct the transcript, upon a conflicting showing, the word ''rats'' was changed to ''rackets.''

There were several other acts of claimed misconduct set forth in the brief such as permitting defendant to be cross-examined on the contents of a postal card purportedly sent out by defendant's counsel to Oklahoma, offering a reward for the apprehension of defendant because of forfeiture of the bail bond on which the attorney was a bondsman. The court rejected the offer of the card in evidence but its contents were otherwise fairly well disclosed by the cross-examination.

Assuming the truth of the affidavit, it is quite apparent that the main argument might well have led the jurors to believe that the prosecutor had just obtained information from the police department in Arkansas pertaining to the incredibility of Sells' testimony and was accordingly going to prosecute him for perjury before another jury. Although the commission of the offense and the evidence of defendant's presence at the scene of the crime was otherwise sufficiently established, we are convinced that defendant did not have a fair trial as is contemplated by law, and the saving clause of section 4½ of article VI of the Constitution is not applicable. Some of the instances, standing alone, probably would not be

sufficient to justify interfering with the verdict. However, we believe, as to several of the incidents, such is not the case. The cumulative effect of these errors requires a reversal of the judgment. (*People* v. *Kirkes*, 39 Cal.2d 719, 726 [249 P.2d 1]. ██ Counsel have no right to avail themselves of the opportunity of addressing themselves to the jury to make assertions upon their own knowledge which, if admissible at all, could be so only under the sanction of a witness' oath. That solemn statements of fact, not by way of argument and deduction from the evidence, but as of counsel's own knowledge, are likely to have weight with juries, cannot be doubted. The respectability and standing of counsel only serve to enhance the peril. (*People* v. *Pantages*, 212 Cal. 237, 247 [297 P. 890].)

██ The giving of a modified instruction to the effect that if the jury believed defendant guilty of the commission of any of three kinds of theft mentioned in the Penal Code, it would not be necessary to state, in the verdict, which of the three forms of theft was committed, provided ". . . it also finds, beyond a reasonable doubt, that defendant was guilty of conspiracy to commit the crime of theft," was proper.

Judgment and order denying a new trial reversed and a new trial ordered.

Mussell, J., and Burch, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.