[Crim. No. 5126.   Second Dist., Div. One.   July 28, 1954.]

THE PEOPLE, Respondent; v. WARREN EUGENE
BARTGES, Appellant.

Lowell Lyons for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In the first of two informations filed by the district attorney of Los Angeles County, defendant was charged with forgery of a check in the amount of $400, with intent to cheat and defraud Louisa A. Delaney, and the Bank of America, while the second information charged the defendant, jointly with Forrest Jameson, with the crime of grand theft of the sum of $1,000 from Frank Earl Simmons. To each of the charges contained in the aforesaid informations defendant Bartges pleaded not guilty. The codefendant in the last-mentioned information, Forrest Jameson, moved for severance of his trial and his motion was granted. Subsequently, amended informations as to each offense were filed wherein it was charged that defendant Bartges had previously been convicted of arson in 1932, larceny and larceny by bailee in 1941, and grand theft in 1949, and that he had served a term of imprisonment for each prior conviction. Defendant denied the prior convictions. On motion of the district attorney the trials on both informations were consolidated. Trial before a jury resulted in convictions on the charges contained in the two informations, and the jury found the allegations of each previous conviction to be true. Motions for a new trial were denied and consecutive sentences pronounced. From the judgments of conviction and from the order denying his motions for a new trial defendant Bartges prosecutes this appeal.

The factual background surrounding these prosecutions, insofar as defendant Bartges is concerned, may be thus epitomized.

About two months prior to December 19, 1952, Frank Earl Simmons met defendant at Steve's Cocktail Lounge in South San Gabriel, Los Angeles County. During that time they saw each other on some 30 different occasions. Approximately a week before December 19, 1952, defendant told Mr. Simmons that a Mr. Medina had been killed in an accident at his place of employment; that he, the defendant, was the attorney for the widow, Mrs. Medina; that she needed some money quickly in order to save her house; and that if Mr. Simmons would lend her the money he would get it back with interest and a bonus from Mr. Medina's insurance, in about 60 to 90 days. Believing, and relying on the statement of the defendant that he was the attorney for Mrs. Medina, and that Mrs. Medina had to save her home, Mr. Simmons withdrew $1,050 from his savings account and bought with it a

cashier's check payable to the defendant. He handed the check to the latter, who endorsed and cashed it. The defendant then handed $50 to Mr. Simmons, who had included that sum in the check because he needed it himself and didn't want to make out two checks. Mr. Simmons lent the money to the defendant so he could give it to Mrs. Medina and thereby "save her house." Mr. Simmons wanted something to show for his money so the defendant had prepared an "Agreement to Act as Trustee" to distribute the money as he saw fit, and a promissory note in the amount of $1,275 payable within 90 days, which he signed. The defendant said that the $275 was interest at 6 per cent plus a bonus.

About two months later Mr. Simmons saw the defendant, who told him that things would be "straightened out" and Mr. Simmons would get his money.

Mr. Simmons testified he gave the defendant the $1,000 believing that the latter's statements were true, and he would not have given him the money if he had known that any of the representations were false.

Max Medina, the husband of Mary Medina, died in September, 1952, from injuries suffered while working at Southwest Welding Company. A week after Mr. Medina died, the defendant called upon Mrs. Medina and told her he was a lawyer. Forrest Jameson, who was with the defendant, said that he was the defendant's brother-in-law, and that he used to work where Mr. Medina did. The defendant said that he wanted to be Mrs. Medina's lawyer, and she told him she had her own lawyer. She owned the home where she was living at that time, and her monthly payments therefor were up to date. The defendant did not act as her attorney at any time, nor do anything in connection with the settlement or collection of any claim arising out of her husband's death. The defendant never gave her any money at any time; she never asked him for any; nor did she ever tell him that she needed any.

Concerning the charge of forgery, the record reflects Louisa Delaney, 83 years of age, owned a home in Alhambra, and the defendant rented a room from her and lived there for several months, including March of 1953. She gave the defendant money on occasions, including $700 and $1,000, which she gave him to use to pay off some people who he told her needed money. She had a checkbook which she kept in her pocketbook in a dining room cupboard, but sometimes forgot and left it on the mantel in her living room, to

which the defendant had access. She signed her name to the last check form in the book. She did not give the defendant or anyone else permission to fill in the check form, or to remove it from the checkbook. That check on the Alhambra Branch of the Bank of America dated March 2, 1953, payable to the order of "Gene Bartges" in the sum of $400, was cashed and charged to Mrs. Delaney's account. It bore Mrs. Delaney's signature which she had previously put on it, but she had not filled in the words "March 2, 1953, Gene Bartges, $400," nor had she given the defendant or anyone else permission to fill in the check over her signature.

On March 10, 1953, Officer Miller of the Alhambra Police Department, asked the defendant if he had cashed the $400 check, and he said that he had.

Appearing as a witness in his own behalf, defendant testified that he was an unemployed salesman; that he was a boarder at Mrs. Delaney's house along with four others; that upon as many as 20 times he had borrowed money from her. With reference to the check involved in the forgery charge, defendant testified that on March 2d he asked Mrs. Delaney to lend him $400, and she agreed to do so. He wrote the face of a check out, and Mrs. Delaney signed it. He cashed it at the Alhambra branch of the bank upon which it was drawn.

Regarding the grand theft charge, defendant testified that he first met Mr. Simmons, the complainant, in a bar in South San Gabriel, and five or six months thereafter asked to borrow money from him. In connection with the claimed solicitation of a loan from Mr. Simmons, defendant testified that on the night in question he went to the Simmons home in company with his brother-in-law (the codefendant named in the information charging grand theft), where defendant talked with Simmons concerning a loan which they had previously discussed. That on the following day he and Simmons went to the bank in Monterey Park where the loan was made. Defendant testified that he then went to a notary public in Monterey Park and had an agreement and note prepared. He further testified that he told Mr. Simmons he wanted to borrow some money "to take care of ways" that he might be able to get money from an insurance firm in New York. The loan was to be for 90 days, and was to cost the defendant $275 plus 6 per cent interest. Defendant testified he received a check for $1,050, and gave Mr. Simmons $50 of it as Mr. Simmons was short of spending money; that he gave Simmons the note and trust agreement at the time he

got the check, and Mr. Simmons read it. That the last thing Mr. Simmons said after the defendant received the money was that the latter should be sure to see him on the day the note became due on March 19th. That the note was not due at the time the defendant was arrested.

The defendant testified that he met Mrs. Medina on the 25th or 26th of September, 1952. His brother-in-law, Forrest Jameson, had told him about a very good friend who had been killed in an accident at Southwest Welding. Jameson wanted to pay his respects to the widow, and asked the defendant to go with him. When they got to Mrs. Medina's sister's home they met Mrs. Medina, her sister, and a son. That they talked to Mrs. Medina very little, as it was stated that she did not understand English. The defendant discussed ways and means of suing the Southwest Welding with the son. That he did not tell anybody that he was an attorney. That Mr. Jameson said that the defendant was well acquainted with the law, and had a very good friend in Tucson, Mr. Stone, who had handled many lawsuits. The defendant advised the Medinas to talk to Mr. Stone. He also said that he would help them if they needed him, but they said they did not need him because they had an attorney. That he did not ask Mrs. Medina for any money.

The defendant admitted he was convicted of arson in 1932, larceny and larceny by bailee in 1941, and grand theft in 1949. That at the time of his arrest he had no bank accounts nor any other assets in California with which to repay any of the claimed loans.

Appellant's first contention is "that the evidence was insufficient to prove forgery; it showed a voluntary loan. A straight business transaction. No intent to deceive." In other words, it is appellant's claim that the evidence was insufficient to prove the crime of grand theft through obtaining money by false representations. That the transaction amounted only to a usurious business transaction devoid of any intent to deceive, and that there was no corroboration of the false representation. That an accused may be convicted of a grand theft upon sufficient proof showing either larceny, embezzlement, or obtaining money by false pretenses is clearly established in our law (*People* v. *Cannon,* 77 Cal. App.2d 678, 688, 689 [176 P.2d 409]; *People* v. *Cook,* 10 Cal.App.2d 54, 57 [51 P.2d 169]; *People* v. *Jones,* 61 Cal. App.2d 608, 622 [143 P.2d 726]).

To constitute theft by trick or device, the following

elements must be present: (1) there must be a taking; (2) there must be an asportation of the thing taken; (3) the thing taken and carried away must be the property of another; and (4) the taking and carrying away must be with an intent, without claim or pretense of right or justification, to deprive the owner of his property wholly and permanently. (*People* v. *Edwards,* 72 Cal.App. 102, 112, 116 [236 P. 944].)

▐ The evidence in this case as hereinbefore narrated is amply sufficient to justify a finding by the jury of larceny by trick and device. Without again setting forth the evidence in detail, suffice it to say that it clearly shows that appellant, with a preconceived design to appropriate the money to his own use, obtained possession of it by means of fraud and trickery. The fraud vitiated the transaction and the owner is deemed still to retain a constructive possession of the property. The owner does not part with title to the alleged thief where, as here, he delivered it to appellant to be applied by the latter to a particular purpose and the recipient, having obtained possession with the preconceived intention to appropriate the money to his own use, subsequently did convert it to his own use instead of applying it to the purpose contemplated by the owner. Under the facts here present there was in contemplation of the law of larceny a "taking."

▐ Asportation is shown by evidence that when appellant obtained delivery of the money from Mr. Simmons he did not intend to devote it to the use for which it was given him but to convert it to his own use. Upon receipt of the money he intended to keep it as his own and the conversion was then complete. ▐ Since the money belonged to Mr. Simmons and appellant acquired possession of it by fraud and chicanery, his holding was without right, and title thereto did not pass to him (*People* v. *Edwards, supra,* pp. 113, 116; *People* v. *Rae,* 66 Cal. 423, 425, 427 [6 P. 1]).

▐ The fourth and last essential of larceny, that is the felonious intent, without claim or pretense of right or justification to deprive the owner of his property wholly and permanently, was amply established by evidence from which the jury could find that appellant was not an attorney; that he was not the attorney for Mrs. Medina; that he did not represent Mrs. Medina in any way; that Mrs. Medina was not in danger of losing her house; and that she never asked the appellant for money, told him that she needed any nor received any from him. The jury could also reasonably find that the appellant knew that such were the facts, as they con-

cerned him personally. From the evidence that the appellant made false representations to the contrary in his efforts to secure $1,000 from Mr. Simmons, knowing that they were false, there would seem to be no other logical inference which could have been drawn but that he intended, without claim or pretense of right or justification, to deprive Mr. Simmons of the money wholly and permanently.

Consideration of the evidence leads unerringly to the conclusion that the appellant tricked Mr. Simmons into delivering $1,000 to him, and that the money was not used for the purpose for which it was intended. Indeed, it is difficult to see how the jury could have done other than find appellant guilty of grand theft.

Appellant's contention that the absence of corroboration vitiates the conviction is without merit. ■ No corroboration is necessary to sustain a conviction of grand theft of money by trick and device (*People* v. *Reed,* 113 Cal.App.2d 339, 352 [248 P.2d 510]).

Coming now to the consideration of the forgery charge, while appellant asserts generally that the evidence is insufficient to support such conviction, he does not specify or otherwise discuss wherein the evidence is deficient. He has failed to discuss this point or cite any supporting authorities in his brief. ■ It is the duty of an appellant to show error and that means he is under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent. (*People* v. *Bryant,* 101 Cal.App. 84, 91, 92 [281 P. 404].) We have, however, read the record. ■ The evidence therein contained, showing as it does that Mrs. Delaney signed the check in blank, did not give appellant or anyone else permission to fill it in and cash it, and that the check, made payable to appellant, endorsed and cashed by him completely demonstrates the latter's guilt of the charge of forgery and leaves no doubt in our mind that the verdict is amply supported. (*People* v. *Howard,* 46 Cal. App.2d 722 [116 P.2d 802].)

■ Appellant next asserts that he was denied a fair trial when the court sustained the objection of Forrest Jameson to testify. In this regard it appears that Jameson was charged jointly with appellant with the crime of grand theft but his trial had been severed. He was subpoenaed by appellant as a witness. Upon being sworn and stating his name, he said to the court: "Upon the advice of my attorney, Beecher S. Stowe, I stand upon my constitutional rights and

refuse to testify on the ground that I have a criminal action pending in this Court and any evidence which I may give may tend to incriminate me.''

Appellant's attorney then stated that the questions he would ask would not tend to incriminate the witness, ''but questions which would pertain only to the defendant in this action . . . the only questions I intend to ask this witness would tend to incriminate Mr. Bartges (the appellant).''

When the court asked appellant's counsel to state the purport of the questions he would ask, the attorney stated:

''Yes, your Honor. I will ask him questions pertaining to the meeting of Mr. Bartges, the manner in which he met Mr. Bartges at the outside, and also his means of existence; the way he lives, his character, and the circumstances or background pertaining to his meeting the witness Simmons. I do not believe that such questions could in any way incriminate this witness. I will ask him nothing at all about the other witnesses in the case, namely, Mrs. Delaney. I fail to see how those questions could tend to incriminate this witness.''

In passing upon the question of whether or not he would compel the witness to testify, the trial judge said:

''Well, in one case he is a co-defendant with Bartges, and under the circumstances anything that might involve any type of relationship with Bartges might tend to incriminate this witness. Therefore, I do not want to compel him to testify in this matter. I am going to sustain the objection. You have your record here.''

The ruling of the court was correct. We are not here confronted with a situation wherein Mr. Jameson was in the position of a witness having no connection with any person named in the information. He was charged jointly with appellant in the same information with the crime of grand theft.

Section 2065 of the Code of Civil Procedure relating to witnesses reads in part: ''. . . but he need not give an answer *which will have a tendency* to subject him to punishment for a felony'' (emphasis added).

And, with reference to our constitutional provision (Cal. Const., art. I, § 13) it has been held that the words ''criminal case'' as used in the Constitution are broader than ''criminal prosecution''; that ''To bring a person within the immunity of this provision, *it is not necessary that the examination of the witness should be had in the course of a criminal prosecution against him, or that a criminal proceed-*

*ing should have been commenced and be actually pending.* It is sufficient if there is a law creating the offense under which the witness may be prosecuted. ▬ If there is such a law, and if the witness may be indicted or otherwise prosecuted for a public offense arising out of the acts to which the examination relates, *he cannot be compelled to answer in any collateral proceeding, civil or criminal, unless the law has absolutely secured him against any use in a criminal prosecution of the evidence he may give*; and this can only be done by a statutory provision that, if he submits to the examination and answers the questions, he shall be exempt from criminal prosecution for any offense that may be disclosed as a consequence of his examination. (*Ex parte Clarke*, 103 Cal. 352 [37 P. 230]; *Counselmen* v. *Hitchcock*, 142 U.S. 547 [12 S.Ct. 195, 35 L.Ed. 1110]; see also Rose's U.S. Notes); *Karel* v. *Conlan*, 155 Wis. 221 [144 N.W. 266, 49 L.R.A.N.S. 826].) There has been no immunity law in this state since the repeal of section 1324 of the Penal Code that will justify a court in compelling a witness to give self-incriminatory evidence." (Emphasis added.) (*In re Tahbel*, 46 Cal.App. 755, 758, 759 [189 P. 804].)

In the case at bar, the witness Jameson was actually charged jointly with appellant in the same information with the same felony for which appellant was on trial. Mrs. Medina had testified that the witness Jameson was with the appellant when the latter called upon her and asked to become her attorney. Mr. Simmons testified that Jameson was with the appellant when the latter came to his house and discussed the loan, and said that the appellant had always paid back money he had loaned him. He was charged, along with the appellant, with grand theft of the money from Mr. Simmons. The matters about which the appellant's attorney proposed to question the witness Jameson might well have shown that he knew the appellant and the appellant's way of life, and that he had met Mr. Simmons.

We are persuaded that answers tending to show such association and actions might well "have a tendency" to incriminate the witness, showing as they would, the presence of the witness with his codefendant when the latter was laying the foundation for his scheme, and thereby warranting a possible inference that the witness aided and abetted appellant in securing the $1,000 from Mr. Simmons.

▬ What was said in *In re Crow*, 126 Cal.App. 617, 619 [14 P.2d 918], is applicable to the problem now confronting

us. "The authorities on the general subject under discussion are quite exhaustively considered in *In re Berman,* 105 Cal. App. 37 [287 P. 125]. The object of such constitutional and statutory provisions as our own is stated on page 46 as follows: 'The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,* protection against being brought by means of his own evidence within the penalties of the law.' It is clear, however, as indicated in the opinion that a witness may not arbitrarily refuse to answer a question on the ground that his answer might incriminate him when the court can determine as a matter of law that 'no direct answer which the witness may make can tend to incriminate him.' But here any direct answer showing that petitioner was present at the time and place that the offense was alleged to have been committed upon her by the defendant doctor would certainly 'have a tendency' to subject her to punishment under section 275 of the Penal Code."

It is also significant that the record is barren of any offer by appellant in the trial court of what he expected to prove by the witness Jameson. We are not apprised of what evidence beneficial to appellant, if any, was denied him by the ruling of the court. Having failed to make an offer of proof showing the character of Jameson's proposed testimony, it can not be said that the exclusion thereof was necessarily prejudicial to the appellant. We have examined the authorities cited by appellant to sustain his contention that he was denied due process of law by the ruling of the court herein and are satisfied they do not militate against our conclusion that, under the circumstances present in the case at bar, it was the right and privilege of the witness Jameson to refuse to testify.

Finally, appellant contends that no prior convictions were proved under section 664 of the Penal Code and therefore, it was error for the court to order that the sentences imposed run consecutively and to deny probation. Since Penal Code, section 664 relates only to punishments for attempts, and since neither the primary charges contained in the information, nor the prior convictions pleaded, related to attempts, we shall assume that appellant intended to rely on section 644 of the Penal Code. However, the last cited section refers to certain crimes, upon the conviction of which, with certain specified prior convictions and services of imprisonment, the accused may be found to be a habitual criminal. However, none of the primary charges contained in the information herein, grand theft and forgery, is mentioned in section 644,

and further, the court did not adjudicate appellant to be a habitual criminal. Therefore, he cannot be heard to complain that the court failed to follow any procedure prescribed for determining the sufficiency of evidence of such priors, service of prison terms, or the nature of the priors that might be necessary to sustain an adjudication that he was a habitual criminal.

In the instant case the prosecution introduced three sets of certified copies of records from state prisons, each showing commitment to such institutions of someone bearing the same name as appellant and also the fingerprints and photos of the person committed. These records established the convictions and commitments charged in the informations herein. Sergeant Hager of the Alhambra Police Department, duly qualified as an expert in fingerprint identification, took a set of fingerprints from appellant at the time of the latter's arrest. These the witness compared with those appearing in the foregoing prison records, formed an opinion, and testified that all of the fingerprints were those of the same person. There being no evidence to the contrary, we are impressed that a prima facie case was established that appellant had been thrice previously convicted of felonies and had served terms of imprisonment therefor. (*People* v. *Wilson,* 139 Cal. App. 139, 142 [33 P.2d 476] ; Pen. Code, § 969b.)

The deficiency in the information which appeared in *People* v. *Morton,* 41 Cal.2d 536, 540 [261 P.2d 523], relied upon by appellant, is not here present. In the case at bar the nature of the three prior offenses is made clear by the record, showing them to be arson, larceny and grand theft, all recognized by the laws of California (Pen. Code, §§ 447a, 484; *People* v. *Savage,* 66 Cal.App.2d 237, 242 [152 P.2d 240] ).

There being no evidence to the contrary, it will be assumed that the law with respect to the crimes charged as prior convictions in the sister states is the same as it is in California (*People* v. *d'A Philippo,* 220 Cal. 620, 626 [32 P.2d 962] ).

While the offense of larceny by bailee, as alleged in the prior conviction asserted to have occurred in the State of Oregon is not known by that name in California, nevertheless, the law of our state specifically provides that a bailee who fraudulently converts the bailed property to his own use is guilty of embezzlement (Pen. Code, § 507), which is a theft (*People* v. *Cannon, supra,* pp. 678, 689, 691).

■ Since appellant was shown to have been convicted of at least three prior felonies it cannot be said that in imposing consecutive sentences herein the court was improperly influenced to the prejudice of appellant by the prior conviction of larceny by bailee in the State of Oregon (*People* v. *Morton, supra,* p. 545).

■ The matter of granting or denying probation is committed to the sound discretion of the trial court (*People* v. *Jackson,* 89 Cal.App.2d 181, 182 [200 P.2d 204] ; *People* v. *Wiley,* 33 Cal.App.2d 424, 429 [91 P.2d 907] ). And it is well settled that an order denying probation will not be reviewed on appeal unless it be shown there was a manifest abuse of discretion (*People* v. *Wiley, supra,* p. 429). ■ Where, as here, it was shown that appellant had previously been convicted of three crimes which he admitted on cross-examination, we cannot say that the denial of probation under such circumstances, amounted to an abuse of discretion.

For the foregoing reasons the judgments and the order denying defendant's motions for a new trial are, and each is affirmed.

Doran, J., and Drapeau, J., concurred.