[Crim. No. 5543. Second Dist., Div. Two. May 23, 1956.]

THE PEOPLE, Respondent, v. HOWARD N. GILLIAM, Appellant.

Harrison M. Dunham and Harold J. Ackerman for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Emmett Seawell, Deputy Attorney General, for Respondent.

ASHBURN, J.—Convicted of six counts of grand theft (Pen. Code, §§ 484, 487, subd. 1) defendant appeals from the judgment and relies upon the sole claim of insufficiency of the evidence to support the verdict.

██ The victims of defendant's false pretenses were incredibly credulous and greedy, but that does not absolve defendant from guilt. On the civil side of the law of fraud it is said: "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery. . . . 'He may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth. . . .' (Prosser, Torts, 749.)" (*Seeger* v. *Odell*, 18 Cal.2d 409, 415 [115 P.2d 977, 136 A.L.R. 1291].) This rule (seldom applied) is tempered by the further consideration that: "Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. . . . 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " (*Seeger* v. *Odell, supra.*) ██ On the criminal side it is recognized that " [t]he guilty party is prosecuted in the interest of the people of the state, and not in the interest of the party defrauded." (*People* v. *Skidmore*, 123 Cal. 267, 268 [55 P. 984].) ██ Foolish reliance by the victim of a preposterous fraud does not require that one who has violated the statute should go free on that account. ██ "In determining in cases like the present whether the defrauded party really believed and acted upon the representations of the accused it is proper to consider whether they were of a character to probably induce belief in his mind or in the mind of any person of ordinary intelligence; but the law as it is at this day

understood does not make it essential to conviction that the pretenses must have been such as would probably deceive such a person; the guilt of the accused does not depend upon the degree of folly or credulity of the party defrauded; the rule invoked affords no defense against a criminal charge." (*People* v. *Cummings,* 123 Cal. 269, 272 [55 P. 898].) To the same effect are *People* v. *Smith,* 3 Cal.App. 62, 65-66 [84 P. 449] ; *People* v. *Bellew,* 90 Cal.App.2d 801, 802 [203 P.2d 822] ; 22 Am.Jur. § 27, p. 459; 35 C.J.S. § 15, p. 652; 25 C.J. § 26, p. 598.

■ Review of the evidence must be governed by the rule laid down in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] : " '. . . before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . ■ We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' ■ If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury."

On August 19, 1954, defendant caused to be published in the Los Angeles Times, a metropolitan newspaper, the following advertisement: "Investors Wanted, Inactive, for Nevada gambling enterprise. Will assure by contract 30% monthly profit on your investment from $300 to $300,000. P. O. Box 561, Glendale 5, California." He received responses from four people, Michael V. Barton, Larry E. Robinson, J. B. Furman, and one Garber. All of them "invested" in defendant's "enterprise" and all but Garber were prosecution witnesses. Defendant's mode of approach and his subsequent procedure were substantially the same in each case. Following initial inquiry by a prospect defendant under an assumed name, Vincent Surrocco,[1] sent him a letter, bearing no street address, merely a Glendale post office box, typified by the

---

[1] He had filed a fictitious firm name certificate showing that he was doing business under the name "Surrocco Enterprises" but he had done nothing to formalize or publicize the use of the name "V. Surrocco" or "Vincent Surrocco."

one addressed to Barton. It reads: "Citrus 3-5991. Post Office Box 561, Glendale 5, California. August 30, 1954. Mr. M. V. Barton, 1771 Griffith Park Boulevard, Los Angeles 26, California. Dear Mr. Barton: I appreciate your interest in my advertisement in the Los Angeles Times. Since this operation is highly profitable to the investor, I don't feel it necessary to disclose the methods or details of operation other than to tell you that it is a Nevada gambling venture. As stated in the advertisement, I am prepared to give you as an investor a contract assuring you a 30 per cent profit monthly on your investment. I realize that to the cautious investor this may not seem to be enough security, but one must remember that a highly profitable investment cannot be secured as the low-profit type. Thus it is up to you to decide whether you prefer a 360 per cent profit annually with the security mentioned or 6 to 8 per cent annually with more security. As you can see, we all stand to gain more by pooling our investments to make the larger profits available only on investments of huge sums of money.

"I am cooperating fully with those who have already invested in the venture. I have given several of them 60-day options in their contracts. If they are not satisfied with the profits at that time, I will return their investments in full. As you know, Nevada gambling is the most profitable business in operation, but it takes large sums of money to finance it. It is seldom that you will be offered an opportunity to invest in a venture that is as sound and still as profitable as this one.

"If after consideration, you are still interested in investing with us, please let me know as quickly as possible, giving me definite details as to the amount you wish to invest, and whether or not you wish the 60-day option. I will have your contract drawn up and will then contact you. Sincerely yours, V. Surrocco." When the money was forthcoming a contract, drawn by defendant, was forwarded to the "investor." These contracts differed somewhat, but in the main followed the form furnished to Barton; so far as pertinent it reads: "This agreement made the 3rd day of September, 1954, between Surrocco Enterprises . . . the party of the first part, and M. V. Barton . . . the party of the second part, witnesseth: That the said party of the first part, . . . hereby covenants with the said party of the second part that the said party of the first part will deliver to the said party of the second part at his home in said City and County of

Los Angeles, monthly, beginning with the 3rd day of October, 1954, an amount equal to 30% of $300.00. . . .

"It is further agreed that this contract may be cancelled by either the said party of the second part or by the said party of the first part upon 30 days notice to the other interested party, at which time the said party of the first part will deliver to the said party of the second part the balance due as agreed upon in this contract.

"Included also in this contract is an option to be exercised on the 60th day after the signing of this contract. If the said party of the second part so desires he may request and receive from the said party of the first part the entire amount invested. However, should said party of the second part desire to leave his investment with said party of the first part, then after the sixtieth day it shall automatically revert to the first, second and third paragraphs of this contract. . . ."

It is claimed that these documents, being promissory in form, could not constitute a basis for a charge of false pretenses. ■ It is settled however, that a promise made with an existing intent not to perform may constitute a false pretense within the grand theft statute. (*People* v. *Ashley*, 42 Cal.2d 246, 262-265 [267 P.2d 271]; *People* v. *Weitz*, 42 Cal.2d 338, 343 [267 P.2d 295].) The jurors in this case were justified in inferring that defendant at the time of making them intended not to perform his promises.

■ He operated under an assumed name and through a post office box without disclosure of his true name or his business or residential address. His advertisement offered to "assure by contract 30% monthly profit on your investment from $300 to $300,000." Thirty per cent of $300,000 is $90,000. The promise was to pay that much each month. Defendant had not the capacity to do this and hence it is an inevitable inference that he did not intend to do so. If that is true of the maximum amount, it would seem also true of the lesser sums, such as Barton's $300 investment.

Defendant's plan, so he testified, was to use the investors' money to play roulette in Las Vegas, not to run a gambling establishment but to play against the house. He claimed to have a tried system that would yield the promised return. Barton was told that the investment would be returned in case the venture failed. His contract contained both a 30-day cancellation clause and a like 60-day termination option. On cross-examination defendant testified that in each instance he intended to perform "if the money were not lost,

all funds were not lost.'' Also that he *meant* that the investors would get their money on exercise of either option *if* the money was not lost. Of course the promise was individual and absolute. Obviously he did not intend to make good out of his own pocket and his promise was just as good as his prospect of winning the guaranteed 30 per cent a month. He had no reasonable basis for expecting to do that. He knew that the odds of his type of play were more than 50 per cent against the player and that a 30 per cent profit was ''pure speculation.'' ''I had a pretty fair idea that the outcome would be profitable. Of course, not being a profit (sic) I had no way of knowing exactly what the outcome would be, of course, similar to what you would find in any other venture.''

The second victim was Robinson, who turned over to defendant $1,200 on the strength of the advertisement, letter and contract. He had no personal interview with defendant. All of the transactions under discussion followed the same general pattern and thus each shed light upon the others.

That defendant did not intend to make good on his promises is further evidenced by the fact that he continued to obtain money from Furman after he had notified Barton and Robinson that their contracts were cancelled because ''[d]ue to circumstances beyond our control we are forced to discontinue operation of the Nevada project in which you were interested.'' On the witness stand he claimed that all the money then had been lost. Assuming that he was using the various investors' funds in Las Vegas gambling as he claimed, it was not true that all the moneys had been lost because he was in possession of funds received from Furman. He told Barton that ''[y]ou will recieve from us the balance due as also agreed upon in the contract with reference to this cancellation.'' But instead of keeping his promise he appropriated all the funds to his own exclusive use. Neither Barton nor Robinson ever heard from defendant again. Their letters and telephone calls were unanswered until Robinson notified defendant that he would contact the police, whereupon he received an unsigned letter reading as follows: ''Your recent letter to Vincent Surrocco Enterprises was forwarded to them at their new mailing address. All further correspondence should be mailed to them at General Delivery, Las Vegas, Nevada.''

The Furman dealings cast a revealing light upon the whole series of transactions and upon defendant's underly-

ing intent. The first investment followed the same lines as Barton's and Robinson's. Furman was living in Centralia, Washington (later, Portland, Oregon). He, a professional musician, had the misfortune to see the advertisement in the Los Angeles Times of August 19, 1954. In response to an inquiry from him defendant sent a form of contract with a request that he, Furman, fill in the blanks, sign the instrument and forward his check. Furman dated the contract September 8, 1954, filled in the amount of $560 and inserted the words "per year," making the pertinent portion read: "[T]he said party of the first part will deliver to the said party of the second part, at his address in said city and county, monthly, beginning with the _____ day of ―――――, 19—, an amount equal to 30 percent of $560.--, per year." In transmitting the contract and check Furman advised defendant that he "expected to have a few thousand available for further investment in a short time." Under that same date of September 8,[2] Furman received from defendant a letter reading as follows: "Please find enclosed a money order to the amount of $14.00. This is the first of your returns on your investment of Sept. 8, 1954. It is indeed a pleasure to forward this to you. Having your previous coorespondence before me I see that you planned to invest further with us, on October 5, and November 5. and upon receipt of your returns from a trust deed. Please feel free to forward to the writer any amount you wish to invest, at the same rate of interest as the original contract." In a follow-up letter of September 14, defendant made further reference to future investments by Furman. On November 10th defendant forwarded a proposed contract covering an additional investment of $1,640 (later increased to $2,440); the letter contained this postscript: "Also please find enclosed a money order to the amount of $14.00 which is your November dividend due Nov. 8, and again may I apologise for the delay." Enclosed was a second $14 check. Defendant testified that prior to sending these two "dividend" checks he had notified Barton and Robinson and Garber that the enterprise had "folded" but he never did advise Furman to that effect, and he testified on cross-examination: "Q. Now, isn't it true that at this time Mr. Furman's money had gone down the drain on the gambling tables

---

[2]At the trial it was suggested that this letter should have been dated October 8, 1954.

in Las Vegas? A. Yes, it had. Q. And it had been gone for two months, isn't that right? A. Yes, it had."

Each letter that Furman wrote to defendant spoke of a desire and an intention to make further investments with defendant and in fact, with one exception, each of his four investments was larger than the one preceding, $560, $2,440, $2,000 and $5,000. In discussing a proposed new investment of $7,000 (represented by the $2,000 and $5,000 items) Furman expressed satisfaction with investment in Las Vegas gambling, sought and received assurance that his money would be so invested; he was also promised that it would be secured by an interest in a Hollywood night club located on Sunset Strip. At the time this assurance was given defendant, according to his own testimony, had lost all funds previously forwarded by Furman but had not disclosed the fact to him. After defendant received the $2,000 and before the $5,000 came through he sent to Furman two checks for $55 and $20, respectively which appeared to be dividend checks. He told investigating officer Knowles that they were dividend checks but he could not say on what amount. Furman's $2,000 and $5,000 remittances were both deposited in defendant's personal bank account and he never sent to Furman a contract covering either sum.

Defendant claimed in his talk with Knowles that Furman's money had been lost in Nevada gambling. At the trial he gave a different version. He there testified that the $2,000 and the $5,000 were used in purchase of a restaurant known as "La Madelon"; that that deal was rescinded and Furman's money switched to the purchase of a Santa Monica restaurant known as "Adam's Rib"; also that that restaurant was owned by a new corporation named "Gilliam Enterprises" and that Furman was owner of 50 per cent of the stock. Furman never heard of "La Madelon" by name. He thought at all times that his money was invested in part-ownership of a Nevada gambling establishment. He never heard of "Adam's Rib" or of "Gilliam Enterprises."

On February 8, 1955, defendant advised Furman that "[d]ue to unforseen circumstances in Nevada our gambling enterprise has run into extreme financial difficulties" and that "otherwise unnecessary risks" would have to be taken. This was followed by a communication of the 22d to the effect that "our Nevada gambling venture has been forced to a financial halt due to extreme financial setbacks recently

as I explained to you earlier." On the 11th of February Furman had written to defendant but that letter was returned by the post office department. Numerous subsequent letters were sent to defendant demanding the return of Furman's money; same were not returned but he did not hear from Gilliam until June, 1955. On that day he came to Furman's home in Portland, Oregon, and spent most of the day trying to effect a fabrication of evidence in the shape of a statement signed by Furman, one designed to exonerate defendant of the charge of grand theft that had been filed against him on May 25, 1955.

The conclusion that defendant deliberately and consistently defrauded Furman and that he never had any intention of performing any of the promises made to him or to the other victims is well fortified by the evidence.

The proof also sustains a finding of larceny by trick and device. (*People* v. *Bartges*, 126 Cal.App.2d 763, 770 [273 P.2d 49]; *People* v. *Mason*, 86 Cal.App.2d 445, 450 [195 P.2d 60]; *People* v. *Owens*, 117 Cal.App.2d 121, 123 [255 P.2d 114]; *People* v. *Sears*, 124 Cal.App.2d 839, 853 [269 P.2d 683]; *People* v. *Chamberlain*, 96 Cal.App.2d 178, 182 [214 P.2d 600].)

Defendant's attempted explanations of the matters above mentioned, and others equally damaging, were rejected by the jury and by the trial judge who denied defendant's application for probation.

The judgment is affirmed.

Moore, P. J., and Fox, J., concurred.