[Crim. No. 5877.   Second Dist., Div. Two.   July 24, 1957.]

THE PEOPLE, Respondent, v. BEN R. REINSCHREIBER et al., Defendants; SAMUEL H. CHODAK, Appellant.

Victor O. Geretz for Appellant.

Edmund G. Brown, Attorney General, and Bonnie Lee Hansen, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant Chodak appeals from a judgment convicting him and his codefendant, Ben R. Reinschreiber (also known as Reiner),[1] of two counts of grand theft from J. Jay Saklad (Pen. Code, § 487, subd. 1) and one count of conspiracy to cheat and defraud by criminal means (Pen. Code, § 182, subds. 1 and 4). Count I of the information charged both defendants with grand theft of $15,000 from Saklad on March 3, 1954; it was dismissed as to defendant Chodak and defendant Reiner was acquitted on that count. The charges upon which defendants were convicted were conspiracy, theft of $6,000 on April 29, 1954, and theft of $3,000 on April 30, 1954. Jury trial was waived by both defendants.

Appellant makes two points on appeal, (1) that the evidence is insufficient to sustain the conviction, and (2) that the crime, if any, was obtaining money by false pretenses, which must be corroborated in the manner required by section 1110, Penal Code, and that there is no such corroboration.

As to the sufficiency of the evidence, it is established that a reviewing court "must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) So viewing the evidence, it proves to be abundantly sufficient.

Mr. Saklad, engaged in business as a builder, was the uncle of Reiner's wife. Prior to the occurrences involved herein, Reiner had been convicted of grand larceny in the State of Washington in 1944; of issuing a check without sufficient funds in Los Angeles in 1950; later, in 1955, was also found guilty of four counts of grand theft.[2]

On Monday, March 1, 1954, defendant Reiner told Saklad he had bought a piece of property in Las Vegas from a Mrs. Freidlander for $42,500; that it had 356 feet of frontage on Highway 91 across the street from the Sands Hotel; that he had made a $2,500 deposit and needed $10,000 or $15,000

[1]For convenience we use the shorter name of that defendant.
[2]See *People* v. *Reinschreiber,* 141 Cal.App.2d 688 [297 P.2d 658].

to close the deal, which must be done by Wednesday or he would lose his deposit; that he could raise the rest of the money, and if Saklad would supply $10,000 or $15,000 he would have a one-third interest in the property. Reiner took Saklad to Ideal Mortgage Company, where they sought a loan of $15,000 for two or three days; Reiner told Mr. Lee of that concern he could pay it off by the next Monday, but Lee said it must be a three months' loan. Thereupon, Saklad mortgaged three properties owned by him, gave a mortgage note for $16,500, received $15,000 for same, and turned the money over to Reiner on March 3. Reiner exhibited a check payable to him for $87,400 which he claimed represented the proceeds of sale of certain automobiles; he gave Saklad his personal check for $16,912.50 (amount of mortgage loan, bonus and expenses), explaining that this was done "In case I drop dead," and told him to hold it until the large check cleared, which would be on Monday, and Saklad would then get his money. Reiner then drove Saklad to Las Vegas, showed him the property, said he had already gone into escrow on the purchase of it. There was no escrow in fact; the property did not belong to Mrs. Freidlander but to one Roscoe A. Coffman who had owned it for many years, had not agreed to sell it to anyone, and had never put it up for sale. Reiner had made no deal with anyone concerning it. On the following Monday he told Saklad not to deposit the $16,912.50 check because the one for $87,400 had not cleared. The first-mentioned check was dishonored when later presented to the bank. Saklad testified that the $15,000 was not a loan and if he got it back on that Monday he was to repay it to Reiner for his one-third interest in the property, doing so upon the sale of the houses which he had mortgaged. Reiner claimed throughout the trial that that $15,000 and the later sums of $6,000 and $3,000 were loans and nothing else.

Several weeks after the foregoing events, Reiner enlisted the aid of defendant Chodak for the specific purpose of "stalling" Saklad, and Chodak did carry out the plans and suggestions of Reiner in that regard. Reiner told Saklad that he had met in Reno one Weinstock, a retired Detroit liquor man, who represented a syndicate that would build a large hotel on the Las Vegas property; that he had had Weinstock checked and found he was part owner of Harold's Gambling Casino in Reno, was worth $5,000,000, had partners worth not less than $1,000,000 to $1,500,000 each. Reiner arranged a meeting at the Armstrong-Schroder Restaurant in Beverly Hills and there

introduced Chodak to Saklad under the name of Weinstock, which name was used by appellant throughout later dealings. The reason for the use of this fictitious name was explained by Reiner as follows: "Because my wife knew Mr. Chodak as Mr. Chodak and had her uncle have asked me for the money in front of her and I mentioned Mr. Chodak was going to lend it to me to stall him, she knew that he didn't have it." Appellant testified that the name Weinstock was used "[b]ecause of the possibility that Mr. Saklad might discuss my name with his niece." At this meeting, Chodak said his syndicate would build a five hundred room hotel on the Las Vegas property provided that they receive a 99-year lease at a rental of $5,000 a month; this was agreed upon and it was further said that Reiner and Saklad should have a 9 per cent interest in the hotel and its casino,—one-third of it to Saklad and two-thirds to Reiner. Two days later Saklad was told that Weinstock had decided on the deal and Reiner took him to a room at the Beverly Wilshire Hotel which Chodak had rented under the name Weinstock for a day and two nights, doing so for the specific purpose of meeting Saklad there. He there outlined and agreed to the deal, including the 9 per cent interest, and said he was going East to cash some securities and raise a million dollars to place in escrow, also $60,000 to cover the first year's rent of the hotel; that the rent would start with the opening of escrow and the hotel would be commenced within three months or the million dollar deposit would be forfeited; that the plans were then being drawn. · Saklad testified: "Well, Reinschreiber, I probably heard from him maybe every day or every other day because he used to call upon the phone, and, of course, we were naturally happy that this deal was going to go through. Q. What did Mr. Reinschreiber say on the telephone on these various dates? A. Well, the same thing. He reiterated it over and over again, that it is a good deal and that we will [be] able to retire and live in Vegas and all of that stuff, and he also mentioned so many different things pertaining to Weinstock and the deal, how good the deal was and all of that stuff." Before the end of April Chodak telephoned Saklad twice saying he was in New York and still engaged in raising the money. Actually he was in the Los Angeles area. ██ About the 21st of April Reiner told Saklad that Weinstock was ready to go ahead, but would not do so as there was a $25,000 attachment on the property which had been placed on it by a big jeweler from whom he (Reiner) had borrowed money; that he needed

$15,000 to clear the lien. Then they met Weinstock, who insisted the property must be cleared or his group would not proceed with the deal; he refused to consent to the retention of $25,000 in escrow and stood upon the proposition that the property must be free and clear. At that meeting or immediately after it, Reiner urged Saklad to raise the necessary $15,000. He assured him that the million dollars was on deposit in the Bank of America in Los Angeles, spoke of Weinstock's great wealth, and urged Saklad to get the money. When he, after contacting his brothers in the East, pleaded inability, Reiner said that he had raised $6,000 and urged Saklad to borrow the remaining $9,000 from friends. This he did, and turned over $6,000 to Reiner on April 29 and $3,000 on April 30, all in reliance on Reiner's and Chodak's statements and conduct (these sums are the subjects of counts III and IV of the information). For this $9,000, Saklad's interest in the land was increased from one-third to one-half. He was to have no other reimbursement. Next appellant reported that he had verified a lifting of the attachment and would go to escrow on the following Monday. When that day came, he met Reiner and Saklad in front of the escrow office and reported that a partner had died and he could not then proceed; that he was arranging for a new partner and would give a tentative lease to show good faith and would prepare and send it. Such a draft, unsigned, was received by Saklad through the mail in due course. Among other things, it described the land as belonging to Reiner and Saklad. Next the victim received a call from Weinstock saying he was in Reno and one of his partners had been delayed in raising his share of $200,000; that he had to get rid of him and would not go ahead with a mere $800,000. Thus things progressed until defendant Reiner was arrested by the F.B.I. on some charge, which was about June 1. There was no syndicate, no million dollars, no sixty thousand dollars, no securities to be sold in New York, no trip to New York, no partners of Chodak dead or alive, no attachment levied upon the land, and no intention to do any of the things promised by Reiner and Chodak or by either of them. All the promises and representations were false and were intended to extract money from Saklad, in which objective defendants succeeded.

In his testimony Reiner said: "Q. Did you in fact tell him some falsehoods to stall him [Saklad]? A. Yes, sir. Q. Did you arrange for some falsehoods to be told to him? A. I did, sir. Q. Now, was this for the purpose of getting the money

or for the purpose of stalling payment on the money? A. For the purpose of stalling payment on the money and from keeping my wife [from] knowing about it. Q. . . . Mr. Reinschreiber, in your relationships with Mr. Saklad had you always had some sort of a big deal cooking? A. Yes, sir. Q. Did you always talk about it? A. Yes, sir. Q. Were a lot of them in fact figments of your imagination? A. More or less wishful thinking or figments of my imagination, yes, sir.''

When Chodak was arrested he said he had no land transaction with Saklad, could not place him, never met him, never registered at the Beverly Wilshire Hotel under the name of Weinstock or at all. Later, when in jail, he said he wanted to cooperate with the officers, that he had not previously told them the truth. Officer Hull testified: ''He says 'I don't owe Mr. Reinschreiber any allegiance and I never got anything out of this deal. I did just as Ben told me. He said that he had this option on this land up in Las Vegas. . . . Ben set up the whole deal. I was to stall this Saklad, which I did. It was a dirty deal. Ben will try to put it off on me. I met Saklad using the name Weinstock and told him I was a big show from back East. Sure, I sent him the phony lease. It was in my handwriting. . . . Q. Did you inquire of Mr. Chodak what the 'stall' was to be in reference to Mr. Chodak's statements? A. He stated that he was to act the part of a big shot, a multi-millionaire from back East, and he was to 'stall' and keep the heat off as Mr. Saklad was causing Ben some trouble, and that was what he was doing. . . . Q. Isn't it true that he told you that this was a 'stall' to give him time for the repayment of a loan? A. No, he did not say that it was a 'stall' for the repayment of a loan. . . . Q. What did he say regarding that? A. He stated that it was a dirty deal and that he was ashamed that he had any part in it. . . . At the end of the conversation Mr. Smith said something 'Well, you knew what this deal was all about, didn't you, Harry?' And Mr. Chodak said 'Yes. I knew it was a scheme to defraud Saklad.' ''

The tenor of the defense was that Saklad did not buy into a Las Vegas property venture but made loans to Reiner for no specified purposes, and that Chodak's participation was directed merely to the stalling of Saklad with respect to repayment of these loans. There are some aspects of Saklad's testimony which point in the direction of a loan of the original $15,000 (the count upon which Reiner was acquitted

and Chodak dismissed), but Saklad testified that, although Reiner said he would get his money back on the following Monday and gave him the check for $16,912.50, "[h]e knew I had these houses for sale and when I was to sell the houses I was to reimburse him again for the $15,000.00 to retain my one-third interest in this land after I sold these houses." (The reference was to the houses which Saklad had mortgaged to raise the $15,000.) Moreover there would have been no occasion for the elaborate stall about building a five hundred room hotel on the Las Vegas property if Saklad had no interest and was to have no interest therein. The court rejected the loan theory with respect to the $6,000 and the $3,000 items, and it cannot be said that it was not justified in so doing. It was for the trial judge to say whether Saklad actually believed and relied upon defendant's statements and promises.

"On the criminal side it is recognized that '[t]he guilty party is prosecuted in the interest of the people of the state, and not in the interest of the party defrauded.' (*People* v. *Skidmore,* 123 Cal. 267, 268 [55 P. 984].) Foolish reliance by the victim of a preposterous fraud does not require that one who has violated the statute should go free on that account. 'In determining in cases like the present whether the defrauded party really believed and acted upon the representations of the accused it is proper to consider whether they were of a character to probably induce belief in his mind or in the mind of any person of ordinary intelligence; but the law as it is at this day understood does not make it essential to conviction that the pretenses must have been such as would probably deceive such a person; the guilt of the accused does not depend upon the degree of folly or credulity of the party defrauded; the rule invoked affords no defense against a criminal charge.' (*People* v. *Cummings,* 123 Cal. 269, 272 [55 P. 898].)" (*People* v. *Gilliam,* 141 Cal.App.2d 749, 751 [297 P.2d 468].)

Appellant's arguments stress the fact that the trial judge found the $15,000 transaction, which occurred before Chodak came on the scene, to be a loan not induced by fraud; and his counsel insists that the obtaining of the $6,000 and the $3,000 must fall in the same category. Of course this is a *non sequitur.* If it be assumed that Saklad had loaned $15,000 to Reiner, that would not justify him in making false representations and promises to induce Saklad to put up more money to protect the loan. All of the joint activities of Chodak and Reiner were directed toward convincing Saklad that he would

lose his original $15,000 (be it loan or investment) unless he put up additional money to clear the property (which Reiner claimed to own) from the lien of an attachment, also to lead him on in the belief that he would have a half interest in a promising venture if he furnished the additional $9,000. Appellant was convicted of participating in the procuring of this money through fraud, not the original $15,000; and he was justly convicted.

With respect to the conspiracy, this case is one of those rare instances in which it is proved by defendant's testimony of an express agreement. True, he sought to attach an innocent objective to it, but the circumstances conclusively refuted this phase of his testimony.

█ Appellant's argument, made in reliance upon section 1110, Penal Code,[3] cannot prevail. Counsel says that the crime, if any was proved, was that of obtaining money by false pretenses and section 1110 requires corroboration of the fact of the pretense; that the inclusion of obtaining money by false pretenses in the definition of grand theft (by the 1927 amendment to Pen. Code, § 484) has not affected this rule; and that there is no corroboration at bar. The substantive proposition of law is sound (see *People* v. *Carter,* 131 Cal. App. 177, 183 [21 P.2d 129]; *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271]).[4] But it is only the pretense which must be corroborated (*People* v. *McCabe,* 60 Cal.App.2d 492, 497 [141 P.2d 54]), and section 1110 says that this may be done by testimony "of one witness and corroborating circumstances." Here the one witness is Saklad and the corroborating circumstances are shown by admissions of appellant and the testimony and conduct of both defendants. In *People* v. *Frankfort,* 114 Cal.App.2d 680, 701 [251 P.2d 401], this

[3] § 1110. "Upon a trial for having, with an intent to cheat or defraud another designedly, by any false pretense, obtained the signature of any person to a written instrument, or having obtained from any person any labor, money, or property, whether real or personal, or valuable thing, the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances; but this section does not apply to a prosecution for falsely representing or personating another, and, in such assumed character, marrying, or receiving any money or property."

[4] The evidence probably would also sustain a conviction on the theory of obtaining money by trick and device (*People* v. *Bartges,* 126 Cal. App.2d 763, 770 [273 P.2d 49]; *People* v. *Gilliam, supra,* 141 Cal.App. 2d 749, 758; *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271]).

court said: "Defendants cite section 1110 Penal Code and argue that the testimony of the respective victims covering the false representations made was not corroborated. The rule is that in this class of cases the circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons are proper matters for the consideration of the jury, and may be looked to to furnish the corroborative evidence contemplated by the law." To the same effect, see *People* v. *Harrington*, 92 Cal.App. 245 [267 P. 942], and *People.* v. *Reed*, 113 Cal.App.2d 339 [248 P.2d 510].

The judgment is affirmed.

Moore, P. J., and Fox, J., concurred.