MITCHELL BARRY AND BETTY LOU BARRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barry v. Commissioner
Docket No. 14053-89
United States Tax Court
T.C. Memo 1991-382; 1991 Tax Ct. Memo LEXIS 447; 62 T.C.M. (CCH) 427; T.C.M. (RIA) 91382; August 12, 1991, Filed *447 Decision will be entered for the respondent. John N. Moore, for the petitioners. Carol A. Szczepanik, for the respondent. BUCKLEY, Special Trial Judge. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned pursuant to the provisions of section 7443A(b)(3). [1]
By notice dated December 31, 1984, respondent determined a deficiency in petitioners' 1984 Federal income tax in the amount of $ 5,754. After a concession by petitioners, [2] the sole issue to be decided is whether petitioners are entitled to a theft loss deduction in a transaction involving a diamond. Some of the facts *448 have been stipulated and they are so found. Petitioners, who filed a joint return for 1984, resided at Solon, Ohio, when they timely filed their petition herein. Hereafter, references to petitioner refer to petitioner husband, Mitchell Barry. FINDINGS OF FACT Sometime in 1980, petitioner saw an advertisement in a newspaper regarding investment grade diamonds for sale. He responded to the ad and met three times with Mr. Homer Curd, representing American Diamond Corporation, regarding the purchase of an investment grade diamond. Petitioner and American Diamond entered into a purchase agreement on April 28, 1980, in which petitioner agreed to purchase a 1.31 carat diamond, grade VSI, color F, for $ 17,460 per carat. Petitioner paid for the diamond, which turned out to be 1.32 carats and accordingly priced at $ 23,047, by exchanging shares of stock of Litton, American Electric Power, and Centran. The record, however, does not reveal the fair market value of the shares which were exchanged for the diamond, but petitioner believed he paid the full purchase price by the exchange of shares. Petitioner received the diamond from American Diamond sometime in July of 1980. Petitioner *449 is not a gemologist. He did not receive a written appraisal of the diamond when he bought it. Rather, he went with Mr. Curd to a jeweler who "certified" it in a transaction characterized by petitioner as high-pressured. The record contains no evidence to indicate that petitioner sought the advice of others, that he ascertained the market value of the diamond prior to acquiring it, or that he had any expertise in regard to diamonds or indeed any other gems. Petitioner received a telephone call sometime early in 1984 from David King of Rare Gem Galleries, in Los Angeles, California. Mr. King advised petitioner that he had the customer lists of American Diamond and inquired if petitioner would sell him the diamond for $ 25,000. Petitioner knew that the value of the diamond had gone down since he purchased it. He agreed to the $ 25,000 price and made arrangements to send the diamond to GIA Gem Trade Laboratory, Inc. (hereafter GIA), in Los Angeles, which was in the business of grading diamonds. Petitioner, by transmittal letter dated January 14, 1984, requested GIA to verify the diamond which was enclosed and further provided "After your verification and confirmation to me, please *450 forward" to Rare Gem Galleries. Petitioner testified that he expected GIA to advise him regarding the certification first, and that he would then authorize them to release the diamond when he had the $ 25,000 check from Rare Gems. Petitioner registered the package containing the diamond to GIA and listed the value at $ 30,000. Petitioner never met Mr. King and apparently knew little if anything about the operations of Rare Gem Galleries. We find it incredible that petitioner would have expected to receive $ 25,000 for a diamond which he himself knew was not worth that much. However, we also find it incredible that petitioner would simply send the diamond to GIA without giving GIA clear instructions about the release of the diamond to Rare Gems and without any written agreement from Rare Gems regarding the sale of the diamond. It may be that petitioner is simply naive, but he did not so strike the Court during his testimony. Petitioner did not hear further from GIA until long after he heard that the diamond had been picked up by Rare Gem Galleries. Once he found out that Rare Gem Galleries had the diamond, petitioner had a few conversations with David King who told him there *451 would be a slight delay in payment until the diamond was sold, then he was given one excuse after another as to why Mr. King was unavailable to speak to him. Later, petitioner had conversations with the president of Rare Gems, Bruce Kaufman, which did not result in receipt of the sales price. Subsequently, on March 20, 1984, petitioner received by registered mail a box from Rare Gem Galleries containing three transparent purple sugilite stones. Petitioner had the three stones appraised, and the appraisal valued the stones solely on the labor cost of cutting them which was approximately $ 15 per stone, or $ 45. Sometime after receiving the three sugilite stones from Rare Gem, its president offered petitioner $ 10,000 for the three stones. Petitioner accepted that offer, but Kaufman did not follow through on his offer. Thus, petitioner received only the three stones, worth $ 45 in all, for his diamond. Subsequently, by letter dated August 24, 1987, GIA confirmed that it had verified the diamond and released it to Rare Gem Galleries. Petitioner never received the $ 25,000 or any other amount with the exception of the three worthless stones. Petitioner contacted the Los Angeles *452 Police Department, the Jewelers' Vigilance Committee, and the Federal Trade Commission about his diamond, all to no avail. The Jewelers' Vigilance Committee suggested he seek legal counsel. Petitioner did not file a report with the police, he did not file an insurance claim, nor did he seek legal assistance to regain his diamond or the funds in question. On their 1984 income tax return, petitioners reported a theft loss from business and income producing property in the amount of $ 23,002, consisting of their claimed cost basis of $ 23,047 less the three stones received ($ 45). On their return they indicated that the fair market value of the diamond before the theft was $ 6,500. The value of a 1.32 carat diamond, with clarity grade VSI and color grade F was $ 5,676 on April 6, 1984. At the time of trial, Homer Curd was deceased, Rare Gem Galleries was not in operation, and David King and Bruce Kaufman were nowhere to be found. Petitioners contend they sustained a theft loss in 1984; respondent contends that there was no deductible loss within the meaning of section 165 sustained during 1984. OPINION Petitioners bear the burden of proving respondent's determination is incorrect. *453 Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Section 165(c) provides as here applicable that, in the case of an individual, deduction for losses shall be limited to (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit; and (3) losses from casualty or from theft falling outside (1) or (2). Section 165(h)(1) limits the deduction for a casualty or theft loss to the lower of fair market value at the time of the casualty or theft or cost basis, less $ 100. Additionally, the loss is allowable only to the extent it exceeds 10 percent of the individual's adjusted gross income. Sec. 165(h)(2). The only evidence in this record that petitioner bought the diamond for investment purposes is his own scant self-serving testimony that he bought it for investment, to which we give little, if any, weight. Petitioner has failed to prove that he held the diamond in a trade or business, or that the loss was incurred in a transaction entered into for profit. Accordingly, the only deduction potentially available to petitioner is a loss from theft under section 165(c)(3). We now consider whether a theft occurred. *454 Whether or not the activity in question constitutes a theft is determined by the law of the State where the loss was sustained. Edwards v. Bromberg, 232 F.2d 107 (5th Cir. 1956). It is not, however, a prerequisite that there be an actual conviction for theft under State law to sustain the deduction for theft. Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without opinion 523 F.2d 1053 (5th Cir. 1975); Vietzke v. Commissioner, 37 T.C. 504 (1961). This loss occurred in the State of California, so we consider the statute and cases of that state. Section 484 of the California Penal Code (Deering 1991) defines theft as follows: (a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, * * * is guilty of theft. * * *
Thus, we look to California cases to ascertain if in fact a theft occurred in regard *455 to petitioner's diamond. It has been held that the crime of theft by false pretenses consists of three elements; (1) the making of a false pretense or representation by the defendant, (2) the intent to defraud the owner of his property, and (3) actual reliance by the owner upon the false pretense in parting with his property. People v. Fujita, 43 Cal. App. 3d 454, 117 Cal. Rptr. 757 (1974), cert. denied 421 U.S. 964 (1975). Further, while a false promise can be the basis of a criminal action for theft, the evidence must establish that failure to keep the promise was not "merely a commercial default." People v. Poyet, 6 Cal. 3d 530, 537, 99 Cal. Rptr. 758, 492 P.2d 1150 (1972). One of the elements of the offense is that the promise must be made with the intent not to perform the act. People v. Kiperman, 69 Cal. App. 3d Supp. 25, 138 Cal. Rptr. 271 (1977). People v. Poyet, supra.
It has further been held that foolish reliance by the victim on a preposterous fraud does not require that one who has violated the *456 statute should go free on that account since the prosecution is in the interest of the people of the State, not of the party defrauded. People v. Gilliam, 141 Cal. App. 2d 749, 297 P.2d 468 (1956). We consider the situation at bar in light of the facts presented at trial, keeping in mind that the burden is on petitioner to show that respondent's determination is incorrect. We are unable to conclude from this record that David King's failure to perform was as a result of his fraudulent intent at the time of making the promise to buy the diamond. The testimony contains at least a hint that the agreement with petitioner was contingent upon Rare Gems selling the diamond. In the posture of this record petitioner has failed to prove that the failure to pay over was from theft rather than from commercial default. Accordingly, we find that petitioner is not entitled to a deduction for a loss from theft pursuant to section 165(c)(3). Decision will be entered for the respondent. Footnotes
1. Section references are to the Internal Revenue Code as amended and in effect for the year at issue; Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners have conceded the disallowance of a rental loss deduction.↩